**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**F. G. McFARLAND and S. R. Hullinger d/b/a McFarland & Hullinger, Respondent.**

**No. 6801.**

United States Court of Appeals
Tenth Circuit.

June 22, 1962.

William J. Avrutis, Washington, D. C. (Stuart Rothman, Dominick L. Manoll and Allison W. Brown, Jr., Washington, D. C., were with him on the brief), for petitioner.

John F. Lee, Salt Lake City, Utah (Peter W. Billings, Salt Lake City, Utah, was with him on the brief), for respondent.

Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.

MURRAH, Chief Judge.

By this petition, the National Labor Relations Board seeks enforcement of its

---

order[1] requiring Respondent-McFarland & Hullinger to bargain with the Union[2], certified as the bargaining representative of its predecessor, Superior Transportation, Inc.

The basic facts, as found by the N. L.R.B. trial examiner in his Intermediate Report, are essentially undisputed. Superior Transportation, Inc., operating out of Naturita, Colorado, hauled ore from mines in Colorado to mills of Union Carbide Nuclear Company at Uravan, Slick Rock and Rifle, Colorado under its contract with Union Carbide. Pursuant to a consent election in March 1960, the Union was certified by the N.L.R.B. as bargaining agent for Superior's truck drivers.[3] Contemporaneously with the Union certification proceedings, Respondent purchased Superior's trucks, trailers, incidental parts inventory and other minor items of equipment and took assignment, with certain modifications,[4] of Superior's hauling contract. Superior ceased its Naturita operations and Respondent hired nine of its drivers.

 There appears to be no controversy relative to the appropriateness of the bargaining unit comprised of Superior's drivers, as was certified by the N.L.R.B. And, there is no contention either that Superior disposed of its Naturita properties in order to avoid bargaining obligations or that Respondent is anything other than a bona fide purchaser.[5] Thus our case is unlike most "succession" cases which primarily concern themselves with whether changes of ownership were truly bona fide or whether they were merely subterfuges for the

avoidance of bargaining agreements, i. e., whether there was merely a disguised continuance of the old employer. See Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718; N. L. R. B. v. Ozark Hardwood Co. (8 CA), 282 F.2d 1; N. L. R. B. v. Birdsall-Stockdale Motor Co. (10 CA), 208 F.2d 234, 46 A.L.R.2d 587. Rather, our question is whether the "succession" of Respondent has changed the employing industry so as to render the certified bargaining unit inappropriate. See N. L. R. B. v. Alamo White Truck Service, Inc. (5 CA), 273 F.2d 238; N. L. R. B. v. Armato et al. (7 CA), 199 F.2d 800. In deciding this question we necessarily deal in terms of succession of employment, and not succession of employers, i. e., in terms of the continued nature of the employment rather than the source of such employment. If the transfer operated to effect a basic change in the employing industry, in the sense that the trucking operation of the predecessor became merged or integrated into the larger business of Respondent so as to lose its identity, then the bargaining unit is no longer appropriate and enforcement of the order should be denied.

Stated simply, Respondent's position in resisting enforcement of the order is that it did not purchase the business of Superior, has not continued the same employing industry, and is not therefore a "successor" employer whose refusal to bargain with the Union was violative of Section 8(a) (5) and (1) of the National Labor Relations Act of 1947 (29 U.S.C. A. § 158(a) (1, 5).

---

1. The Board's decision and order are reported at 131 N.L.R.B. No. 101.

2. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 16.

3. Superior employed, at various times, from fourteen to eighteen drivers. On the balloting date, fourteen of the sixteen voting drivers favored Union representation.

4. Superior had obtained the contract by an assignment from I. Sander, Inc., its parent company, which required the latter's guarantee of Superior's performance. The as-

signment to Respondent relieved both I. Sander, Inc. and Superior from liability under the contract. (And Respondent later entered into a direct contract with Union Carbide which replaced the assigned contract and contained essentially the same terms.)

5. Apparently Respondent had no knowledge of either the consent election, which occurred prior to the transfer of the properties, or the N. L. R. B. certification, which came after the transfer, until some time later when the Union requested Respondent to bargain.

The N. L. R. B. adopted the findings of the trial examiner to the effect that Respondent did succeed to the business of Superior, and that the appropriateness of the certified bargaining unit survived the transfer between them. And, unless clearly erroneous, these findings are conclusive.

As to the issue of successorship of Superior's hauling business, the trial examiner acknowledged that all Respondent paid for was Superior's physical properties, consisting of its hauling and loading equipment, as well as various maintenance equipment and parts. But the examiner perceptively noted that before purchasing these physical properties, Respondent made certain that it would also obtain the contractual rights to haul for Union Carbide; that it took precautions, through acquisition of Superior's state trucking permits, to rule out any trucking competition by Superior in that geographical area; and that absent these assurances, the transfer would not have taken place. The record supports these findings and substantiates the examiner's conclusion that "(R)ealistically viewed * * * the payment for Superior's equipment encompassed both the transfer and the assignment." And, we agree that a true succession of the business enterprise was present.

As to the continued appropriateness of the bargaining unit, the examiner pointed out that although Superior's lease on its Naturita terminal expired a few days after the transfer, and Respondent thereafter moved its newly acquired hauling business to Uravan, a short distance away, "(T)he general character of the operations * * * remained substantially the same." He concluded that the changes in the mode of operations [6] did not substantially alter "the nature of the business transacted by Superior" and that just as Superior's business was the trucking of ore for Union Carbide, "Respondent's principal business at its Uravan terminal, was and is the trucking of ore for Union Carbide." Additionally, the examiner found that "(T)he unit of drivers under Superior at Naturita remained a unit of drivers under the Respondent at its Naturita and, later, Uravan terminal, with no substantial change in the nature of their duties."[7] And, though there is a marked degree of cooperation between Respondent's Uravan operation and others of its trucking terminals, it was found that separate books are kept on each of the terminals and that the terminal supervision of driver personnel is separate and distinct. Indeed, the foreman and supervising officer of Superior was hired by Respondent, along with the nine Superior drivers, and he continued in that capacity at Uravan. The examiner found that "* * * such integration as exists is not of a degree to in any way impair the efficacy of separate bargaining units * * *", and the record amply supports his conclusion that the bargaining unit, admittedly appropriate for Superior's Naturita operation, remained so upon its assimilation by Respondent and its removal to Uravan. The Board's conclusions in this respect have decided weight in view of the wide discretion committed to the Board in the determination of an appropriate bargaining unit. See Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040; N. L. R. B. v. Jones & Laughlin Steel Corp., 331 U.S. 868, 67 S.Ct. 1725, 91 L.Ed. 1872. It may be that since the certification proceedings and the transaction in question, the Union has ceased to represent a majority of the employees at the Uravan terminal. But even so, that is not a matter for our consideration here. We decide only that the transaction did not operate to destroy the ap-

---

6. Such as the substitution of "loader methods" for "transfer points"; changes in the routing of the ore from points of origin to Union Carbide; and improved road maintenance.

7. The number of drivers utilized by Respondent at Uravan fluctuated between twenty-four and fourteen—varying in correlation to the work load.

222

propriateness of the bargaining agent as established by the certification proceedings.

The petition for enforcement is granted.