**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**INTERSTATE 65 CORPORATION** d/b/a
Continental Inn, Respondent.

No. 71–1198.

United States Court of Appeals,
Sixth Circuit.

Dec. 30, 1971.

---

Nancy M. Sherman, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Jack H. Weiner, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Morris B. Borowitz, Louisville, Ky., Borowitz, Slyn & Russell, Louisville, Ky., for respondent.

Before WEICK, CELEBREZZE and PECK, Circuit Judges.

JOHN W. PECK, Circuit Judge.

The National Labor Relations Board found respondent Interstate 65 Corporation in violation of Sections 8(a) (5) and (a) (1) [1] of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., and has petitioned this Court for enforcement of its order issued pursuant thereto. The principal question presented on review of the Board's findings is whether respondent was a successor of the Pick-Louisville Corporation when it reacquired a motel, the Continental Inn, located in Louisville, Kentucky.

Respondent, a closely-held corporation, built the motel facility in 1961 and operated it as the Diplomat Motel until July, 1962. At that time it was sold to the Pick-Louisville Corporation (hereinafter "Pick-Louisville"), a wholly-owned subsidiary of the Albert Pick Corporation chain of motels. Under the terms of sale, Pick-Louisville assumed respondent's obligations on a note payable to a Louisville savings and loan association, which note was secured by a first mortgage on the motel property. Pick-Louisville also gave respondent cash and a purchase money note along with a second mortgage on the motel real estate and a chattel mortgage on the personal property.

In November of 1962, Pick-Louisville recognized the Hotel and Restaurant Employees and Bartenders Union Local 181 (hereafter "union") [2] as the employees' collective bargaining agent through a card check. The union had authorization cards from 52 of the motel's 65 employees. A collective bargaining agreement was then entered into ef-

---

1. § 158. Unfair labor practices
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of [Title 29];
* * * * *
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of [Title 29].

2. There is no problem in this case with respect to the appropriateness of the bargaining unit. It is made up of all maids, housemen, bellmen, maintenance grounds keepers, cooks, pantry, dishwashers, pot washers, waitresses, busboys, stewards, and bartenders employed by respondent at its motel, excluding office clerical employees, guards, professional employees and supervisors as defined in the Act.

fective from January 1, 1963 to December 31, 1967, and was signed by the union and the "Albert Pick Motel Corporation, Louisville, Kentucky." On May 2, 1968, a successor collective bargaining agreement was negotiated to run from February 16, 1968 to December 31, 1970, and was signed by the same parties. This contract included usual terms as to wages and working conditions and provided for the employer to recognize the union as the exclusive representative of the employees.

Thereafter, Pick-Louisville encountered financial problems and respondent, in order to protect its investment and to avoid a forced foreclosure under the terms of the first mortgage, agreed to reacquire the physical assets of the motel, which sale took place on June 5, 1969. Pick-Louisville was released from liability on the motel property and respondent reassumed its obligations under the first mortgage note as owner of the motel. The resale contract specifically provided that it was for the "repossession of real estate and personalty only, and does not constitute the sale of any business from [Pick-Louisville to respondent]." No provision was made with respect to the outstanding collective bargaining agreement.

Respondent selected Arthur Dlutowski to be the new manager of the motel and he took up residence there a month in advance to prepare for the new operations. The property was described as being in a run-down condition and respondent was given permission to begin extensive repairs and remodeling of the facilities about the time Dlutowski moved in.

There had been no contact between respondent and the union before the date of sale. However, one of Pick-Louisville's waitresses, Iva Adams, testified before the Hearing Examiner herein that a few days prior to respondent's assumption of control, she overheard Dlutowski state in a private conversation with some customers that there would be no union at the motel and that respondent would close the doors before they would have a union. Dlutowski denied the statements, but the Trial Examiner and the Board found that they were made and they, in part, formed the basis for the Board's determination of violations of the Act by respondent.

On the night before the takeover, Dlutowski held a series of meetings with various groups of employees to formally advise them of respondent's pending assumption of control and to have them fill out applications as respondent's employees. While speaking to the group of waitresses, he said that respondent was running an entirely different operation, that there would be no union at the motel, and he conditioned their new employment on their willingness to work without a union. At the same meeting he announced a 5 cent an hour increase in their wages.

There was also testimony before the Trial Examiner alleging refusal by respondent to hire two of the waitresses, one of whom was Iva Adams, because they would not accept employment without a union. The Board, however, found the existence of other reasons which it concluded caused the two to decline employment with respondent and this aspect of the case is not now before us on review.

As a result of the above meetings, respondent accepted 50 to 55 of the 60 to 65 employees working for Pick-Louisville on the date of changeover, and there was no hiatus following the transfer in ownership. Respondent simply continued operation the next day of the 141 room motel, including its adjoining dining room, bar and swimming pool, and, as indicated, rehired approximately 80% of the employees who made up the bargaining unit under Pick-Louisville.

Thereupon, the union attempted to gain recognition as the employees' collective bargaining representative. A letter was sent to respondent by the union on June 9, 1969, asserting its representative status. Respondent replied by letter on June 13 stating that it was not a successor to Pick-Louisville and did not feel obligated to bargain collectively

with the union. In November, 1969, the union again tried unsuccessfully to have respondent grant it recognition by urging respondent to institute a check-off system for dues. This too failed and the present action was initiated.

Following a hearing, the Trial Examiner issued findings, recommendations and conclusions. The Board then reviewed the case and found respondent had engaged in unfair labor practices. The Board agreed with the Trial Examiner that:

"[D]espite the change in ownership from Pick to Respondent, or the manner in which Respondent regained control of the motel and thereafter operated it, *the employing industry has remained essentially the same, and* that Respondent, as Pick's successor, is bound to recognize and bargain with the union and honor the contract." (Emphasis supplied.)

The Board decided respondent violated Section 8(a) (5) of the Act as successor employer by refusing to bargain with the union, by refusing to honor the collective bargaining agreement, and by unilaterally changing various terms and conditions of employment, including the elimination of seniority, overtime and premium time. The Board found respondent violated Section 8(a) (1) by stating in the presence of waitress Iva Adams that there would be no union and that the motel would be closed before it would have a union, by announcing to the employees on June 4, 1969, that there would be no union, that their employment was conditioned on working without a union, and by declaring a pay raise for the waitresses of 5 cents an hour without bargaining with the union. It therefore is incumbent upon us to determine whether the above findings of the Board are supported by substantial evidence on the record as a whole. N.L.R.B. v. Downtown Bakery Corp., 330 F. 2d 921 (6th Cir. 1964); N.L.R.B. v. Alamo White Truck Service, Inc., 273 F.2d 238 (5th Cir. 1959).

■■ We turn first to the Board's determination that respondent was a successor of Pick-Louisville. It is well established that a mere change in ownership is not sufficient to permit the new employer to refuse to bargain with the union. Makela Welding, Inc. v. N. L.R.B., 387 F.2d 40, 46 (6th Cir. 1967); N.L.R.B. v. Armato, 199 F.2d 800, 803 (7th Cir. 1952). However, where a substantial change in the nature of the business operations is effected as a result of the change in ownership, a finding of a change in the nature of the employing industry is clearly warranted, relieving the new employer of the obligation to bargain collectively until such time as a bargaining agent for the new employing industry is determined as required by the Act. N.L.R.B. v. McFarland, 306 F.2d 219 (10th Cir. 1962). If respondent's "succession" brought with it a change in the "essential nature of the [employing] enterprise," then respondent had no duty to bargain. Tom-A-Hawk Transit, Inc. v. N.L.R.B., 419 F.2d 1025, 1027 (7th Cir. 1969).

■ Stated succinctly, we must look to all the circumstances accompanying the transfer to determine whether the *nature of the employing industry has undergone such a basic change* that the collective bargaining unit, as it was under the previous employer, is no longer appropriate. N.L.R.B. v. McFarland, *supra*, 306 F.2d at 220; N.L.R.B. v. Alamo White Truck Service, Inc., *supra*, 273 F. 2d at 240. "It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace." N.L.R.B. v. Colten, 105 F.2d 179, 183 (6th Cir. 1939).

Respondent argues first that because of the numerous and widespread changes it made in the physical assets of the motel after the reacquisition it was not a successor with a consequent duty to bargain. These changes, says respondent, were so extensive that the Board could not conclude under present law that the same employing industry was maintained.

Respondent poured approximately $100,000.00 into the motel, 40% of

which was for previously neglected maintenance and repairs. The remainder was spent both to improve the image of the motel from that of a run-down operation to an up-and-coming one and to change over completely from the Pick system of operating. The motel was instead affiliated with the Best Western system and conformed to the Best Western standards of operation.

Among the specific changes relied upon by respondent were: different record keeping systems, different insurance plans, different banking facilities, new telephone system, an increase in room rates (about $1.00 increase per room), and the removal of all Pick signs, billboards and advertising. Other changes included the installation of a new roof, new color television sets, new table linens, new carpeting, new ice machines, new fencing, resurfacing of the parking lots and renovation of the swimming pool.

The top management of the new company was entirely different from that under Pick-Louisville. Moreover, respondent had been in the petroleum business since 1962 and remained in it after its reacquisition of the motel. The volume of its petroleum business amounted to about $300,000.00 annually.

The Board states that notwithstanding the change in top management, the supervisory staff remained much the same. Arthur Dlutowski, the new manager, had been catering manager for Pick-Louisville in 1963–64; the maintenance manager and engineer under Pick-Louisville became respondent's new assistant manager; Pick-Louisville's auditor left and the person who had been the auditor's assistant during 1964–69 became respondent's auditor and bookkeeper; respondent's new catering manager had been temporary manager under Pick-Louisville; the housekeeper stayed on; and a day hostess who had left her job a month prior to the changeover was returned to her former position.

Respondent assumed some of the same leased equipment contracts as Pick-Louisville. Pick-Louisville agreed to cooperate with respondent in securing the alcoholic and malt beverage license and to act as collecting agent for all of Pick-Louisville's outstanding accounts receivable.

While other changes are established by the record, enough have been shown to demonstrate support for the Board's finding that no real basic change in the employing industry had occurred. On June 5, 1969, respondent took over operation of a 141 room motel with its accompanying dining room, bar and swimming pool offering essentially the same services to the public at the same location. While painting the rooms, renovating the swimming pool and generally improving the premises may increase business, they do not alter the nature of the employing industry. Certainly, changing the record keeping systems and the banking and similar facilities has some bearing on whether the employing industry has undergone substantial change, but we cannot find on the basis of the present record that they had any meaningful, perceptible effect on the employer-employee relationship. Any break in the continuity of the employing industry must be shown by respondent to substantially affect the bargaining unit. N.L.R.B. v. Auto Ventshade, Inc., 276 F.2d 303 (5th Cir. 1960). It appears uncontradicted that the functions of the nonsupervisory personnel in the bargaining unit remained essentially the same.

Moreover, retention of some 80% of Pick-Louisville's employees is a most important circumstance in determining respondent's successor status. See Maintenance, Inc., 148 NLRB 1299, 1301–02 (1964). The employees continued to work in a one-purpose facility under some of the same supervisory personnel in the same or similar jobs. In light of the above facts, the Board's finding cannot be said to lack support in the record. Thus, for present purposes respondent was the successor of Pick-Louisville.

We reach this conclusion in spite of respondent's contention that, to be a successor, the new employer must in some

way have taken over the contracts or business of its predecessor. Here, respondent reacquired the physical assets of the motel, but not the goodwill, accounts receivable, liabilities or customer accounts of Pick-Louisville.

Relevant in this regard is the recent case in the Fifth Circuit, N.L.R.B. v. Zayre Corp., 424 F.2d 1159 (1970). Therein, Zayre was found to be a successor employer after it acquired *the physical assets* of a discount department store from a creditor's committee under a Chapter 11 Bankruptcy. After the acquisition, Zayre employed 95% of the persons previously employed by its predecessor, but it also made many significant changes in the operation of the store and other changes which directly affected the working conditions of the employees as a unit. The Court was not persuaded that the employing enterprise was rendered substantially different and concluded that the changes "did not affect the nature of the operations as that of a retail discount house, whether under [the predecessor's] name or Zayre's name." 424 F.2d at 1164. Similarly, in the instant case the nature of the business operation remained essentially intact following the reacquisition.

Respondent relies further upon N.L.R.B. v. Alamo White Truck Service, Inc., 273 F.2d 238 (5th Cir. 1959), in presenting the argument that the nature of a business operation has undergone substantial change where its ownership is transferred from a large, nationwide chain to that of a small, locally-owned company. In that case, the Alamo White Truck Service, a small, locally-owned San Antonio (Texas) corporation, purchased the San Antonio branch office of the White Motor Company, a large, nation-wide manufacturer of trucks. Alamo was held not to be a successor of White, but the case is distinguishable from the instant case in several respects. First, following the sale, Alamo retained none of the former employees of White who had been members of the union. Second, the nature and purpose of the business operation was changed from that of a manufacturer and seller of trucks to one which was primarily a service operation. Third, the Court outlined in detail how the change in the nature of the operations brought with it a change in the method by which labor policies were determined for the employees. Under White, they had been set by a distant home office of the giant corporation, whereas Alamo's policies were made in the context of the close personal relationship characteristic of a small company.

The Board in the present case concluded that the record before it failed to reveal the extent to which Pick-Louisville's labor policies were set by it or the Albert Pick Corporation. Outside of a showing that the collective bargaining agreements were signed by the Albert Pick Corporation, respondent has presented little else to the Board rising above the level of speculation in its effort to prove that it was Albert Pick who controlled the labor policies rather than Pick-Louisville, a small Kentucky corporation. We uphold the Board's conclusion on this record.

■ Having determined that respondent was a successor to Pick-Louisville and was duty-bound to recognize and bargain with the union as the employees' collective bargaining agent, we further conclude that there is substantial evidence on the record as a whole to support the Board's findings of violation of Section 8(a) (5) by refusing to bargain with the union and unilaterally changing some terms and conditions of employment; and violation of 8(a) (1) by informing the employees the night before they commenced employment for respondent that there would be no union at the motel, that their employment was conditioned on their willingness to work without a union and by unilaterally raising the wages of the waitresses. See Overnite Transportation Co. v. N.L.R.B., 372 F.2d 765 (4th Cir.), cert. denied, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967); N.L.R.B. v. Downtown Bakery Corp., *supra*, 330 F.2d 921. We fail to find substantial evidence in this record,

however, to support the Board's conclusion of a Section 8(a) (1) violation on the basis of waitress Iva Adams' testimony that respondent declared there would be no union and it would close its doors before it would have a union. These statements were purportedly overheard by Adams while she was pouring coffee for Arthur Dlutowski and three customers, apparently unconnected with the company. Adams was a union stewardess who admittedly disliked the new manager Dlutowski. Furthermore, she gave evidence of animosity toward respondent because she believed that respondent did not want her as an employee and had in fact refused to employ her while at the same time rehiring 50–55 of the other employees.

Dlutowski denied he made such statements. Moreover, even if he had, it is clear he had no authority as manager to determine under what circumstances "the company would close its doors." It is extremely unlikely that a company in the process of expending $100,000.00 to repair and remodel a motel would at the same time set a policy requiring it to go out of business if forced to recognize a union. Respondent was then in the process of risking capital to save an unprofitable business, in lieu of experiencing a forced foreclosure.

In the face of such circumstances, we think the Board's finding lacks a foundation of substantial evidence. To base a finding of an unfair labor practice upon what a concededly prejudiced former employee alleged she overheard in a private conversation while pouring coffee on her job raises our apprehensions to a high level indeed. The conversation took place prior to the company's takeover. We conclude that this specific finding was clearly erroneous.

■ Our reading of the record herein fails to disclose any reasonable basis on part of respondent to support its contention that, even if it is found to be a successor, it nonetheless cannot be found guilty of unfair labor practices with the union because of its alleged "good faith"

doubt of the union's majority representation. This "good faith" argument does not stand up. No indication of union animus on the part of the employees in the bargaining unit was shown. Pick-Louisville continued to bargain with the union and honor the collective bargaining agreement up until the date of sale.

In view of respondent's conduct at the time of change-over and in looking at its subsequent correspondence with the union, the only reasonable conclusion warranted by the record as to respondent's motives is its assertion of belief that it was not a successor to Pick-Louisville's motel operation.

To instruct employees while they are filling out new employment applications that they are working for a non-union company and would have to forego their union membership under the new operation is entirely inconsistent with any "good faith" doubt of the union's continued majority status. This action at the very least conveys a strong suspicion that the company did not really believe the employees would reject the union if the choice was left to them.

■ This brings us to the final question presented on review of the findings of the Board. Respondent was found in violation of Section 8(a) (5) for refusal to honor the collective bargaining agreement entered into by the union and Pick-Louisville, respondent's predecessor. The question of whether a successor employer is obligated to honor the collective bargaining agreement of its predecessor is currently before the United States Supreme Court on appeal from the Second Circuit in William J. Burns Int'l Detective Agency, Inc. v. N.L.R.B., 441 F.2d 911 (1971), cert. granted, 404 U.S. 822, 92 S.Ct. 99, 30 L.Ed.2d 49 (1971).

We agree with the Second Circuit's resolution of this issue in *Burns*. That court decided the Board had exceeded its powers in ordering a successor employer to honor a collective bargaining contract it had not been a party to. The Board

had never, before *Burns*, found such requirement to exist and we see no change in case law or statutory law which would permit the Board to suddenly reverse itself on this question. *William J. Burns, supra,* 441 F.2d at 915.

Any further discussion on this issue is unnecessary in light of the Supreme Court's pending decision thereon. We simply hold that, in our view, the Second Circuit determination of the issue was correct and we adhere to it.

The Board's order is hereby enforced, except with respect to its finding of violation of Section 8(a) (5) by respondent in refusing to honor the collective bargaining agreement and its finding of violation of Section 8(a) (1) relating to Dlutowski's alleged statements in the presence of waitress Iva Adams that there would be no union and that the motel would be closed before it would have a union.