[L.A. No. 31316. Sept. 10, 1981.]

SAN CLEMENTE RANCH, LTD., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

**COUNSEL**

Robert P. Roy, Dressler, Stoll, Quesenbery, Laws & Barsamian, Charley M. Stoll and Marion I. Quesenbery for Petitioner.

Ellen Lake, Manuel M. Medeiros, Daniel G. Stone, Edwin F. Lowry and Jorge Leon for Respondent.

George J. Tichy II, Robert K. Carrol and Littler, Mendelson, Fastiff & Tichy as Amici Curiae on behalf of Respondent.

Dianna Lyons, Daniel A. Garcia, Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen S. Flores, Federico G. Chavez, Ellen J.

Eggers, Jerome Cohen, William· H. Carder, Ellen Greenstone, Tom Dalzell and Sanford N. Nathan for Real Party in Interest.

OPINION

**TOBRINER, Acting C. J.**—This case arises out of the same factual setting as *Highland Ranch* v. *Agricultural Labor Relations Bd.,* (1981) *ante*, page 848 [176 Cal.Rptr. 753, 633 P.2d 949]. Unlike *Highland Ranch*, however, this case concerns the obligations under the Agricultural Labor Relations Act (ALRA) incurred by San·Clemente Ranch, Ltd. (San Clemente or employer) upon purchasing and subsequently undertaking the farming operation previously run by Highland. After examining all of the circumstances surrounding both the change in ownership and San Clemente's commencement of its business operation, the Agricultural Labor Relations Board (ALRB or Board) concluded that San Clemente should properly be considered a "successor employer" to Highland. It held that San Clemente succeeded, inter alia, to Highland's obligation to recognize and bargain with the United Farm Workers of America, AFL-CIO (UFW or union), the union that was officially certified as the exclusive bargaining representative of Highland's agricultural employees on virtually the same date that San Clemente assumed control of the farming operation. San Clemente now objects to the ALRB's conclusion, maintaining that the Board's successorship determination in this case is inconsistent with the governing federal successorship precedents under the National Labor Relations Act (NLRA).

For the reasons discussed below, we have concluded that the ALRB's determination should be upheld. As we point out, San Clemente's position in this case is fatally flawed in two distinct respects. First, although San Clemente argues that the ALRB's findings with regard to the composition of the San Clemente work force after the change in ownership, taken alone, precluded a determination of successorship under the relevant federal authorities, we conclude that the employer's position rests upon a misreading of the federal cases and that the federal authorities support, rather than conflict with, the ALRB's successorship finding in this case.

Second, and more fundamentally, we shall explain that San Clemente is additionally in error in assuming that in making successorship determinations under the ALRA, the ALRB is obligated blindly to apply

existing federal precedent without regard to the significant differences that exist between the industrial setting of the NLRA and the agricultural setting of the ALRA. As we shall see, in this case the ALRB identified a number of important factors peculiar to the agricultural setting that add complexity to the issue of successorship liability under the ALRA, and that caution against undue reliance upon the single factor of "workforce continuity" stressed by San Clemente. In light of the unique attributes of California's agricultural setting, we believe that the ALRB was totally justified in eschewing the rigid, mechanical test for determining successorship proposed by San Clemente, and in adopting instead a case-by-case approach under which all relevant considerations relating to a change of ownership are taken into account. Reviewing all of the circumstances in the present case, we conclude that the Board's finding of successorship was clearly warranted.

### 1. *The facts and proceedings below.*

As already noted, the legal issues in this case arise from Highland's sale of its farming operations to San Clemente in late November 1977. Our opinion in *Highland Ranch, supra*, sets forth the basic chronology of events leading up to the sale. At the time of its purchase of the ranch, San Clemente was aware that several months earlier the UFW had won an overwhelming victory in a representation election held among Highland's employees and that, on the day before its officials signed the final escrow papers, the UFW had been officially certified by the ALRB as the exclusive bargaining representative for the ranch's agricultural employees. In addition, during the negotiations for the purchase of the ranch, Highland had informed San Clemente of several unfair practice charges that had been filed by the UFW against Highland as a result of Highland's allegedly discriminatory treatment and discharge of several prounion employees. San Clemente consulted its attorneys with respect to its potential liability for these pending unfair labor practice charges, and the ultimate sale agreement between Highland and San Clemente included a contractual provision addressing this matter.[1] Thus, upon acquiring the farming operation, San Clemente was fully cognizant of the union's relationship to the ranch.

Under the terms of the sale agreement, San Clemente acquired substantially all of the ranch assets of Highland, including the ground lease

---

[1]The relevant contractual clause provided that "[a]ny unfair labor charges issued prior to December 15, 1977, against Highland Ranch will be resolved or disposed of by Seller."

and all of the farming equipment and facilities. The administrative law officer (ALO) who presided over the administrative hearing found that in purchasing the ranch, San Clemente planned to carry on substantially the same farming operation as had been conducted by Highland; specifically, San Clemente intended to grow and harvest the same crops in the same places and at the same times, and to process the harvested crops in substantially the same manner, as had been the case under Highland. Moreover, the ALO additionally found that, through the time of the ALRB hearing in March 1978, San Clemente had in fact conducted its operations in the same fashion as had Highland.

Upon taking possession of the ranch on December 1, 1977, San Clemente immediately hired one of Highland's principal supervisors as its ranch supervisor and also employed several additional Highland supervisors to help manage the farm operations. At that time the ranch's tomato crop had just been harvested and the employer's need for agricultural workers was at the farm's annual lowpoint. Consequently, on December 1, San Clemente hired only a single field worker—an irrigator—who had worked for Highland and who was needed to water a recently planted cabbage crop. Over the weeks and months that followed, as the cabbage crop grew to maturity and other crops were planted, tended and harvested, San Clemente hired additional agricultural workers to handle its normal farming tasks. The following table records the makeup of San Clemente's workforce over the four-month period preceding the unfair labor practice hearing held between March 13 and March 30, 1978.

| Date | Total Agricultural Employees | Agricultural Employees Who Had Worked for Highland | Other Agricultural Employees |
|------|---------|---------|---------|
| Dec. 7 | 12 | 12 | 0 |
| Jan. 31 | 31 | 20 | 11 |
| Mar. 7 | 49 | 46 | 3 |
| Mar. 25 | 150 | 70 | 80[2] |

On December 9, 1977, at a time when apparently all of the agricultural employees employed by San Clemente were workers previously employed by Highland, the UFW presented a written demand for nego-

---

[2] Of the 80 workers employed by San Clemente on March 25 who had not worked for Highland, 42 were workers supplied by a labor contractor.

tiation to San Clemente, asserting its certified status as exclusive bargaining representative. San Clemente did not formally respond to the union's demand until December 21, 1977, at which time it refused to bargain with the union on the ground that the UFW was not the certified bargaining representative for its employees.

At the subsequent administrative hearing, San Clemente defended its refusal to bargain with the UFW by maintaining that under federal precedent it should not be found to be a successor employer of Highland with respect to Highland's bargaining obligations. Although San Clemente acknowledged that it had purchased virtually all of Highland's assets, that it had continued Highland's farming operations in toto and that for more than the first three months of its operations a substantial majority of its workforce consisted of former Highland employees, San Clemente took the position that under the federal cases the question as to whether or not it had succeeded to Highland's bargaining obligation could not be determined until San Clemente's workforce had reached its "full complement," which San Clemente asserted was equivalent to either its "peak workforce" or alternatively one-half of its peak workforce.[3] San Clemente further asserted that under the federal authorities it would have a duty to bargain with the UFW only if, at the time it reached this peak or half of peak employment figure, a majority of its workforce had previously been Highland employees.

In conjunction with this legal contention, San Clemente presented testimony of its officers at the unfair labor practice hearing in which they stated that they expected to reach a peak employment of "300 plus" workers in November 1978. This "300 plus" figure had particular significance in light of San Clemente's actual workforce figures set out in the table above, because if the "full complement" concept was defined as either peak employment or one-half of peak employment as San Clemente urged, the "300 plus" estimate would mean that San Clemente had not reached "full complement" until it had hired at least 150 agricultural workers. As the table indicates, the 150 worker figure had not been reached until March 25, 1977, during the administrative hearings, when—for the first time since San Clemente had begun operations—former Highland employees made up slightly less than a majority of San Clemente's workforce.

---

[3]San Clemente's reliance upon the one-half of peak employment concept apparently derives from the fact that under section 1156.4, a certification or decertification election may be conducted only if the agricultural employer's payroll reflects at least "50 percent of the peak agricultural employment for the current calendar year."

The ALO rejected San Clemente's argument and concluded that San Clemente was a successor employer that had succeeded to Highland's bargaining obligation. Although there was substantial evidence presented at the hearing to raise doubts as to accuracy of San Clemente's "300 plus" peak employment estimate,[4] the ALO made no specific finding as to San Clemente's probable peak employment because he rejected the employer's contention that that figure was relevant under the pertinent federal cases. Relying upon a number of NLRB decisions, the ALO concluded that the relevant date for determining "majority status" was the date upon which the union had transmitted its request for bargaining to the employer.[5] Because in this case the union had initially requested that San Clemente bargain with it on December 9, 1977, when San Clemente's workforce was made up entirely of former Highland employees, the ALO concluded that San Clemente's obligation to bargain with the union had vested at that time.

The ALO further found that the fact that San Clemente had subsequently hired a majority of non-Highland employees in the latter part of March 1978 could not abrogate San Clemente's bargaining obligation. He so held both because that hiring process had followed upon San Clemente's continuing refusal to bargain with the UFW and because the change in the composition of San Clemente's workforce resulted in large part from San Clemente's unilateral decision to change hiring practices by utilizing a labor contractor.[6]

In reviewing the ALO's recommended decision in this case, the ALRB agreed with the ALO's ultimate conclusion that San Clemente was a "successor employer" which was obligated to bargain with the UFW. Unlike the ALO, however, the Board did not base its successor-

---

[4]While San Clemente had estimated that it expected to reach peak employment of "300 plus" in November 1978, during the representation election procedure the prior summer Highland's president filed a verified declaration stating that the ranch's peak employment period was in mid-July and indicating that at that time between 250-255 workers were employed at the ranch.

[5]In support of this conclusion, the ALO cited *The Daneker Clock Co.* (1974) 211 N.L.R.B. 719, 721, enforced (4th Cir. 1975) 516 F.2d 315 and *C. G. Conn, Ltd.* (1972) 197 N.L.R.B. 442.

[6]Relying upon *Golden State Bottling Co.* v. *NLRB* (1973) 414 U.S. 168 [38 L.Ed.2d 388, 94 S.Ct. 414], the ALO also held that because San Clemente had notice of the unfair labor practice charges pending against Highland at the time it purchased the business, San Clemente should properly be held responsible for remedying those unfair labor practices by rehiring the improperly discharged employees and taking other appropriate affirmative actions to remedy the effects of Highland's misconduct.

ship determination solely upon the composition of San Clemente's workforce at the time the union had presented its bargaining request. Undertaking a broad overview of the successorship doctrine,[7] the ALRB pointed out that numerous facets of California's agricultural industry —relating to both employers and employees—presented unique complexities in the application of successorship principles and called for a more flexible approach than was reflected in the ALO's reasoning.

The Board observed initially that "[w]ith respect to [agricultural] employers, there is often a difficulty in determining who is the employer of a particular group of employees. [Citations.] Due to the presence of custom harvesters, land management groups, harvesting associations and labor contractors on the agricultural scene, a sale of certain land or crops to another may have nothing to do with, or may have everything to do with, the rights of employees." (5 A.L.R.B. No. 54, p. 12.) The Board also pointed out that "changes occur with unusual frequency in the ownership of property interests in land and crops [citation]," (*ibid.*), exacerbating the potentially detrimental effect such changes might wreak on employee bargaining rights.[8]

Moreover, the Board emphasized that the problems created by the unique attributes of employers and the frequency of land transactions in the agricultural setting are magnified many-fold by the distinct nature of the workforce governed by the ALRA. As the Board noted: "With respect to employees, ... we confront a work force of which a large part moves from one section of the state to another according to the change of crop seasons and the availability of work. [Citation.] As a result of the seasonal nature of the work and the migratory patterns of large numbers of workers, the industry has a high labor turnover. Each season brings with it another hiring process. One crop may have as many as three distinct hiring periods during the course of a year. The unskilled nature of much of the work makes employees more easily replaceable, further contributing to the turnover. Constant personnel changes are also caused by the presence of labor contractors who pro-

---

[7]The ALRB noted that this was its "first case presenting successorship issues."

[8]Subsequent to oral argument in this case, the UFW submitted a letter to this court which purported to estimate the percentage of UFW certifications under the ALRA that have been followed by the transfer of an agricultural business. As the employer has properly pointed out in a responding letter, the material cited by the union is not a proper subject of either mandatory or permissive judicial notice (see Evid. Code, §§ 459, 451, subd. (f), 452, subd. (h)) and we have accordingly attached no significance whatsoever to the submitted material.

vide employees to several different growers.... Further personnel changes or turnover result from the day-haul system whereby workers are obtained on a day-to-day basis at well-known pickup points. Often these workers are selected on a first-come, first-serve basis: whichever workers board the transporting bus first have a job for the day.... Thousands of the state's agricultural employees belong to a fluid, mobile labor pool, making themselves available wherever there is work to be done." (*Id.*, at pp. 12-13.)

After canvassing these numerous complicating factors which exist in California's agricultural context, the Board astutely observed that "[p]rotecting the collective bargaining rights of these workers from erosion due to changes in the ownership of an employing entity, without unduly burdening the transferability of capital in the agricultural industry, is a challenge of no small proportions." (*Id.*, at p. 13.)

In seeking to meet this challenge in the present case, the ALRB scrutinized San Clemente's legal arguments against the backdrop of California's agricultural setting and concluded that San Clemente's position could not be sustained. Although recognizing that a number of federal decisions had placed particular importance upon the "continuity of the work force" between the old employer and the new employer in determining successorship for collective bargaining purposes, the ALRB concluded that "[g]iven the unusual characteristics of agricultural ownership patterns and the agricultural labor force,... an approach to successorship which examines factors in addition to the continuity of the work force is most appropriate. Undue emphasis on the continuity of the work force factor at the expense of other relevant factors would render the important protection provided employees by the successorship principle almost entirely ineffective. We will, therefore, not ignore this factor but will give careful consideration to other factors as well." (*Id.*, at p. 15.)

After reviewing all of the factors in this case, including San Clemente's continuation of Highland's farming operations in toto, the unchanged nature and size of the bargaining unit, as well as the fact that San Clemente had hired a substantial number of Highland employees, the Board concluded that "meaningful principles of successorship can be given effect only by finding that San Clemente is Highland's successor. For us to reach the contrary result would be to miss the forest for the trees." (*Id.*, at p. 18.) The Board accordingly held that San Clemente was obligated to bargain with the UFW and that the employ-

er had committed an unfair labor practice by refusing to meet with the union or to provide the union with relevant information.[9]

In the present petition seeking review of the Board's final order, San Clemente challenges the ALRB's successorship determination, maintaining that the Board erred in concluding that it is under a duty to bargain with the UFW.[10]

■ 2. *Under the circumstances of this case, the ALRB properly concluded that San Clemente succeeded to Highland Ranch's obligations to bargain with the UFW.*

Neither the ALRA, nor the NLRA upon which our state act was largely modeled, contains any specific statutory provision relating to the successorship issue.[11] From the inception of the NLRA in the 1930's,

---

[9]The Board's decision in this case was rendered prior to our decision in *J.R. Norton Co.* v. *Agricultural Labor Relations Board* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306] and as a consequence the Board included in its remedial order a "make whole" requirement without undertaking an evaluation of San Clemente's conduct as required by our *Norton* decision. (*Id.*, at pp. 39-40.) The Board apparently concedes that under *Norton* this aspect of the remedial order must be set aside and remanded to the Board for further proceedings.

[10]San Clemente apparently acknowledges that if the ALRB properly found that it is a successor employer of Highland for collective bargaining purposes, the Board's further conclusion that it is jointly and severally liable for Highland's unfair labor practices relating to the discriminatory treatment and discharge of employees is unassailable since San Clemente clearly had knowledge of the pending unfair labor charges at the time it purchased Highland. (See *Golden Gate Bottling Co.* v. *NLRB, supra*, 414 U.S. 168.) Because we conclude that San Clemente is a successor employer for collective bargaining purposes, we have no occasion in the present case to consider under what circumstances a new employer, who is found not to succeed to a predecessor's collective bargaining obligation, may nonetheless be held liable for pending unfair labor practice charges of which the new employer had notice.

Of course, insofar as we have concluded in *Highland Ranch* v. *Agricultural Labor Relations Bd., supra, ante*, page 848, that several of the ALRB's findings as to discriminatory dismissal or treatment by Highland must be annulled, those portions of the ALRB order holding San Clemente liable for such dismissal and treatment must similarly be annulled.

[11]In 1976, one year after the passage of the ALRA, the California Legislature enacted Labor Code section 1127, relating generally to "successor clauses" in collective bargaining agreements. Section 1127, subdivision (b) defines "successor employer" for purposes of that provision to mean "any purchaser, assignee, or transferee of a business the employees of which are subject to a collective bargaining agreement, if such purchaser, assignee or transferee conducts or will conduct substantially the same business operation, or offer the same service, and use the same physical facilities, as the contracting employer." Subdivision (c) of the provision, however, specifically states that "[t]his section shall not apply to . . . any employer who is subject to the National Labor Relations Act [or the] Agricultural Labor Relations Act of 1975 . . . ."

however, it has been uniformly recognized that some concept of successorship liability is inherent in the fundamental purposes of such labor relations legislation. In *National Labor Relations Board* v. *Colten* (6th Cir. 1939) 105 F.2d 179, the earliest successorship case, for example, a change in the employing entity occurred during the pendency of unfair labor practice proceedings when one of the partners of an employer-partnership died, dissolving the partnership as a matter of law. Recognizing that the NLRA's fundamental purposes would be thwarted if such a change in the identity of an employer operated to abrogate legal obligations under the act, the court in *Colten* emphasized that "[i]t is *the employing industry* that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace.... It needs no demonstration that the strife which is sought to be averted is no less an object of solicitude when *contract*, death or operation of law brings about change in ownership in the employing agency." (Italics added.) (*Id.*, at p. 183.)

In the numerous years that have elapsed since *Colten*, federal administrative and judicial authorities have recognized in a host of cases that the fundamental purposes of the NLRA require that a new "employing entity" assume the statutory obligations of a predecessor employer in a great variety of circumstances beyond the technical change of ownership involved in *Colten*. Thus, successorship liability has been imposed when, as here, the new employer purchases the entire business of its predecessor (see, e.g.; *N. L. R. B.* v. *McFarland* (10th Cir. 1962) 306 F.2d 219), when the new employer acquires a part or all of the assets of its predecessor (see, e.g., *N. L. R. B.* v. *Interstate 65 Corporation* (6th Cir. 1971) 453 F.2d 269) and even when the new employer has not acquired any of the predecessor's assets but has simply hired a majority or a substantial number of employees of a predecessor bargaining unit. (See, e.g., *NLRB* v. *Burns Security Services* (1972) 406 U.S. 272 [32 L.Ed.2d 61, 92 S.Ct. 1571].)

In *John Wiley & Sons* v. *Livingston* (1964) 376 U.S. 543 [11 L.Ed.2d 898, 84 S.Ct. 909], the United States Supreme Court's first successorship decision, Justice Harlan, writing for a unanimous court, placed the basic purpose and significance of the labor relations successorship principle in perspective. Justice Harlan explained: "Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental

to the main considerations. *The objectives of national labor policy, reflected in established principles of federal law [i.e., the successorship doctrine], require that the rightful prerogatives of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.*" (Italics added.) (*Id.*, at p. 549 [11 L.Ed.2d at p. 904].)

In light of the similarities between the ALRA and NLRA, we have no doubt but that the objectives of state labor policy—as reflected in the ALRA—embody a similar concern that the rights of employers to buy and sell agricultural businesses "be balanced by some protection to the employees from a sudden change in the employment relationship." Thus, we think the ALRB was unquestionably correct in concluding that the ALRA contemplates that under appropriate circumstances an agricultural employer who purchases an on-going agricultural business may be bound by the statutory obligations which the act imposes upon its predecessor.[12]

The United States Supreme Court has recognized that because of the great variety of factual circumstances in which successorship issues may arise, and because of the different legal consequences that may be at issue in different cases, no single, mechanical formula can be devised to resolve all successorship issues. As the court emphasized in its most recent successorship decision, *Howard Johnson Co.* v. *Hotel Employees* (1974) 417 U.S. 249, 256 [41 L.Ed.2d 46, 53, 94 S.Ct. 2236]: "[In this context] we must necessarily proceed cautiously, in the traditional case-by-case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad factual circumstances

---

[12]We thus reject as totally without merit the suggestion of one amicus that Labor Code section 1156 should be interpreted to preclude the imposition of successorship liability upon a new employer under any circumstances. Amicus claims that because section 1156 permits the selection of an exclusive bargaining representative only through a secret ballot election, the section should be interpreted to permit the imposition of a bargaining obligation upon a new employer only after an election has been held among the new employer's employees. Amicus points to absolutely nothing in the legislative history of the ALRA, however, which suggests that section 1156 was intended to abrogate the obligations of a successor employer with regard to a union that has been selected in a secret ballot election among its predecessor's employees, and, in our view amicus' proposed interpretation would go far to completely undermine the integrity of such election results by permitting an employer to subvert a union's victory by a simple change in corporate ownership. If the drafters of the ALRA had in reality intended to eliminate the concept of successorship liability that has been firmly recognized by federal labor precedents for more than four decades, we are confident that they would have included a provision in the act specifically so providing.

and legal contexts in which it can arise, and the absence of [legislative] guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."

The *Howard Johnson* court additionally pointed out that in undertaking such a case-by-case analysis, "the real question [a court must answer] in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of 'successor' which is applicable in every legal context." (*Id.*, at pp. 262-263, fn. 9 [11 L.Ed.2d at p. 57].)

In the instant case, the ALRB adopted the cautious, case-by-case common law approach to successorship questions recommended by the federal decisions. Although, as we shall see, San Clemente faults the ALRB for not applying a "bright line," mathematically precise formula in determining its successorship obligations, *Howard Johnson* and the other relevant Supreme Court precedents explicitly recognize the importance of considering the particular facts of the case at hand and the need to give effect to pertinent significant factual differences in various legal contexts. Thus, contrary to San Clemente's assertions, we believe that the ALRB's general approach in this case is consistent with the controlling federal authorities.

The principal legal question at issue in this case concerns whether San Clemente was obligated to recognize and bargain with the UFW after purchasing Highland's assets and assuming control of its farming operations. As we have seen, approximately four months prior to the transfer of the ranch's ownership the UFW had won an overwhelming victory in a Board-conducted election among the ranch's employees, and on November 29, 1977, almost the precise date on which the ranch passed into San Clemente's hands, the UFW was officially certified as the exclusive bargaining agent of the ranch's bargaining unit.

San Clemente acknowledges that if there had been no change in ownership Highland would have been obligated to recognize and bargain with the union in December 1977 and that, barring exceptional circum-

stances, Highland's bargaining obligation would have remained fully in effect for at least a year. This one-year period of guaranteed representative status—known generally as the "certification bar"—"is designed [both] to allow the union ... to carry out its mandate without being put 'under exigent pressure to produce hothouse results or be turned out,' and to minimize an employer's temptation to undermine the union's strength rather than to negotiate and administer a collective bargaining agreement in good faith." (*Dynamic Machine Co.* v. *N. L. R. B.* (7th Cir. 1977) 552 F.2d 1195, 1199 fn. 5. See generally *Brooks* v. *Labor Board* (1954) 348 U.S. 96, 98-104 [99 L.Ed. 125, 131-134, 75 S.Ct. 176, 42 A.L.R.2d 405].)

San Clemente maintains, however, that even though it purchased all of Highland's assets and continued all of the farming operations intact, it should nonetheless be relieved of any obligation to recognize or bargain with the UFW because on March 25, 1978,—four months after it purchased the ranch—a bare majority of its agricultural employees were workers who had not previously been employed by Highland. As we have already noted, San Clemente takes the position that under the relevant federal cases the determination as to whether or not it was under an obligation to bargain with the union could not properly be made until it had reached at least one-half of its expected peak employment, and that it would then be under a bargaining obligation only if a majority of its workforce at that point were former Highland employees. Because the ALRB declined to adopt this "majority at one-half of peak employment" formula, San Clemente maintains that the Board's successorship determination is erroneous and cannot stand.

We find San Clemente's position untenable on two separate grounds. First, contrary to San Clemente's claim, we find the ALRB ruling totally consistent with existing federal authorities. Second, in light of a number of special features of the agricultural setting, we conclude that the specific federal successorship decisions relied upon by San Clemente are not necessarily controlling in this context and that, taking all of the relevant factors into consideration, the ALRB was completely justified in finding successorship liability in this case. We turn initially to the federal authorities.

As San Clemente accurately notes, although the federal cases have embraced a case-by-case approach to the successorship issue, recent federal precedents have generally viewed "a substantial continuity in the identity of the workforce across the change of ownership" (*Howard*

*Johnson, supra*, 417 U.S. at p. 263 [41 L.Ed.2d at p. 57]) as a "key factor" in determining whether or not a new employer succeeds to the bargaining obligations of its predecessor. (See, e.g., *Nazareth Regional High School* v. *N. L. R. B.* (2d Cir. 1977) 549 F.2d 873, 879; *Saks & Co.* v. *N. L. R. B.* (2d Cir. 1980) 634 F.2d 681, 684.) The facts which we have related above demonstrate, however, that such a "substantial continuity in the workforce," as that concept has been defined in the federal authorities,[13] was in fact present in the instant case. As we have seen, San Clemente began its operations by hiring employees who had previously worked for Highland, and the new employer's workforce continued to be made up primarily of former Highland employees for almost the entire initial four months of the new employer's normal farming operations.

San Clemente takes the position, however, that the federal precedents indicate that the issue of "workforce continuity" can only be properly resolved by examining the composition of its workforce at a time when it is either at "peak employment" or, at the least, at one-half of peak employment. San Clemente bases this contention upon a passage in the United States Supreme Court's decision in *NLRB* v. *Burns Security Services, supra*, 406 U.S. 272, 295 [32 L.Ed.2d 61, 77], in which the court indicated that in some situations "it may not be clear until the successor employer has hired *his full complement of employees* that he had a duty to bargain with a union...." (Italics added.) Although *Burns* itself does not refer to "peak employment," San Clemente asserts that the "full complement" concept of *Burns* is equivalent to "peak" or "one-half of peak" employment in the agricultural context.

In our view, San Clemente's attempt to equate "full complement" and "peak employment" is totally unsound. As the facts of *Burns* demonstrate, the "full complement" terminology in that decision was utilized with reference to an employer with a fixed or relatively stable workforce who hires his entire "complement" of employees either before

---

[13]A recent Second Circuit decision states that "[t]he appropriate test of continuity is whether a majority of the successor's bargaining unit is composed of the predecessor's employees." (*Saks & Co.* v. *N.L.R.B., supra*, 634 F.2d 681, 685.) Other federal cases "have questioned whether a successor need have a strict majority of its predecessor's employees to meet this test, or whether a substantial number of employees is sufficient." (*Dynamic Machine Co.* v. *N.L.R.B., supra*, 552 F.2d 1195, 1203, fn. 9 (citing *Boeing Co.* v. *International Ass'n of Mach. Aero. Wkrs.* (5th Cir. 1974) 504 F.2d 307, 317-318, 320-321; *Spruce Up Corp.* (1974) 209 N.L.R.B. No. 19).) In this case, throughout December, January, February and most of March, San Clemente's workforce was comprised of a large majority of former Highland employees.

or shortly after undertaking the business operations.[14] That scenario, of course, is fairly typical in the sale of an on-going business in the industrial realm governed by the NLRA. (See, e.g., *Howard Johnson Co.* v. *Hotel Employees, supra*, 417 U.S. at pp. 250-252 [41 L.Ed.2d at pp. 49-51].) In such a setting, postponing the determination of the new employer's bargaining obligations until a "full complement" of employees is hired ordinarily imposes no significant hardship on employees and entails relatively little, if any, delay. (See, e.g., *N. L. R. B.* v. *Pre-Engineered Bldg. Products, Inc.* (10th Cir. 1979) 603 F.2d 134, 136; *Pacific Hide & Fur Depot, Inc.* v. *N. L. R. B.* (9th Cir. 1977) 553 F.2d 609, 613-614.)

The same would not be true, however, if the "full complement" concept were to be equated to "peak employment" in the agricultural setting, as San Clemente proposes. Because of the great seasonal fluctuations in the workforce of the typical agricultural employer, postponing a new employer's bargaining obligations until peak or one-half of peak employment is reached would frequently deprive agricultural employees of the benefits of representation and collective bargaining for many, many months after the transfer of ownership,[15] at a time when the aid of a union may be particularly needed.[16] In addition, such a hiatus in the bargaining process is bound to weaken the position of a newly selected union and provide the employer with an unfair bargaining advantage. (Cf. *J.R. Norton Co.* v. *Agricultural Labor Relations Bd., supra*, 26 Cal.3d 1, 30-31.)

---

[14]In *Burns*, the new employer, Burns Security Services, took over the security operations at a Lockheed Aircraft facility on July 1, 1968, after it had underbid the prior holder of the security services contract. In June 1968, before actually taking control of the operations, Burns hired its "full complement" of 42 security guards to work at the Lockheed facility; of the 42 guards hired by Burns, 27 had worked for the former employer at the Lockheed site. Although Burns had not purchased any of the old employer's assets and, indeed, did not have any financial relationship with the old employer at all, the Supreme Court affirmed the NLRB's determination that Burns was obligated to bargain with the certified representative of the former employer's bargaining unit, because a majority of the workforce hired by Burns had belonged to that bargaining unit and had recently selected the union in a board-conducted election.

[15]Because the size of an agricultural employer's workforce does not increase evenly throughout the year, but frequently expands exponentially at harvest time, it is not unusual for a farm to reach both peak and one-half of peak employment at approximately the same time.

[16]As one commentator has pointed out: "In some ways the need for stability in union representation is increased in the successorship situation. The period immediately following a change in the employment relationship may be the time when the employees most need a collective voice; union representation may be especially desirable in protecting against the sudden changes in organization, policies and terms and conditions of

There is nothing in *Burns*, or in any of the subsequent federal decisions applying *Burns*, to suggest that the Supreme Court intended its "full complement" concept to be applied in such a manner. On the contrary, given the Supreme Court's explicit admonition in both *Burns* and *Howard Johnson* that its rulings in this area "turn[ ] to a great extent on the precise facts involved [in each case]" (406 U.S. at p. 274 [32 L.Ed.2d at p. 65]; 417 U.S. at p. 256 [41 L.Ed.2d at p. 53]), we are confident that the federal authorities would not construe the "full complement" concept as San Clemente has suggested. In view of the fact that the new employer in this case took over an on-going ranch and continued the regular operations of the business for a substantial period of time with a workforce made up largely of its predecessor's employees, we believe that the federal decisions in this area fully support the imposition of a bargaining obligation upon San Clemente. (See, e.g., *N. L. R. B.* v. *Hudson River Aggregates* (2d Cir. 1981) 639 F.2d 865, 869-871; *Bellingham Frozen Foods, Inc.* v. *N. L. R. B.* (9th Cir. 1980) 626 F.2d 674, 678-680; *N. L. R. B.* v. *Pre-Engineered Bldg. Products, Inc., supra,* 603 F.2d 134, 135-136; *Intern. Ass'n of Machinists, etc.* v. *N. L. R. B.* (D.C. Cir. 1978) 595 F.2d 664, 675, fn. 52; cf. *N. L. R. B.* v. *Hondo Drilling Company* (5th Cir. 1970) 428 F.2d 943, 945-946.)

Moreover, although in this case there was sufficient continuity in the new employer's workforce to support a successorship finding under the prevailing NLRA decisions, we believe that the ALRB was additionally justified in concluding that, in light of the unique characteristics of California's agricultural setting, considerations in addition to workforce continuity should generally play an important role in defining successorship liability under the ALRA.[17] As noted above, in its decision the Board identified a variety of factors peculiar to the California agricul-

employment that a change in employers is likely to occasion. Furthermore, the uncertainty generated by a change in ownership makes union organization particularly difficult." (Fns. omitted.) (Note, *The Bargaining Obligations of Successor Employers* (1975) 88 Harv.L.Rev. 759, 762.)

[17]In *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 412-413 [128 Cal.Rptr. 183, 546 P.2d 687], we noted that "section 1148 directs the [ALRB] to be guided by the 'applicable' precedents of the NLRA, not merely 'the precedents' thereof" and we held that by utilizing this language "the Legislature intended [the ALRB] to select and follow only those federal precedents which are relevant to the particular problems of labor relations on the California agricultural scene." (*Id.,* at p. 413.) In that case we upheld the ALRB's adoption of an access regulation which varied in some respects from the federal counterpart, observing that the Board's departure from federal precedent was based on the agency's determination "that significant differences existed between the working conditions of industry in general and those of California agriculture." (*Id.,* at p. 414.) The same is true in the present case.

tural setting which lead to a very high labor turnover in the average agricultural business in this state: (1) the seasonal nature of employment; (2) the migration of employees throughout the state; (3) the unskilled nature of much of the work; (4) the prevalent use of farm labor contractors; and (5) the "day-haul" system. In light of these various factors, even when no change in ownership occurs there is quite frequently a very significant turnover in the workforce of an agricultural employer during the course of a single year. The California Legislature was, of course, fully aware of this phenomenon when it adopted the ALRA (see Lab. Code, § 1156.4), but nonetheless decided to provide a union which is victorious in a representative election with a one-year certification bar.

Because a substantial turnover in an employer's workforce is a typical feature of California agriculture, the ALRB sensibly reasoned that a change in the composition of a successor employer's workforce does not necessarily have the same significance in this context as such a change may have in the industrial setting of the NLRA. As a consequence, we think the Board properly concluded that in general its evaluation of potential successorship liability should go beyond the question of workforce continuity and include other relevant factors as well.

In the instant case, the Board noted that despite the change in the ranch's ownership, "the agricultural operation itself remained almost identical." San Clemente farmed the same land, used the same equipment and processed the crops in essentially the same manner as Highland had. In addition, the change in ownership brought no alteration in either the nature or size of the bargaining unit. (See *NLRB* v. *Burns Security Services, supra*, 406 U.S. at p. 280 [32 L.Ed.2d at pp. 68-69].) Finally, the employees in the bargaining unit performed the same tasks for San Clemente that they had previously performed for Highland.

In light of this total continuity in the actual operations of the ranch under San Clemente, we believe the ALRB was well justified in concluding that San Clemente should succeed to Highland's bargaining obligations. As several federal decisions have noted: "The degree of continuity between employers in business operations is significant because it serves as an indicator of the corresponding change in expectations and needs of the employees and their views with respect to continued union representation." (*Saks & Co.* v. *N. L. R. B., supra*, 634 F.2d 681, 687; *Intern. U. of Elec., Radio & Mach. Wkrs.* v. *N.L.R.B.* (D.C.Cir.

1979) 604 F.2d 689, 694; *Zim's Foodliner, Inc.* v. *N. L. R. B.* (7th Cir. 1974) 495 F.2d 1131, 1140-1141.) In this case nothing suggests that the continued representation of the employees by the UFW would in any way conflict with the purposes of the act, and to the contrary the failure to recognize San Clemente's duty to bargain would very likely undermine the protection sought to be secured by the ALRA's election procedures.

Accordingly, we conclude that the ALRB properly found that San Clemente had committed an unfair labor practice in failing to recognize and bargain with the UFW.

Let a decree issue (1) setting aside and remanding to the Board the make-whole portion of the order pursuant to *J.R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1 (see fn. 9, *ante*), (2) annulling those portions of the order relating to the dismissal of Francisco Perez Navarro and the denial of a leave of absence to Bartolo Prado Navarro (see fn. 10, *ante*), and (3) enforcing the remainder of the order. San Clemente shall bear the costs of this proceeding.

Mosk, J., Richardson, J., Newman, J., Files, J.,* Kaus, J.,* and Cobey, J.,* concurred.

Petitioner's application for a rehearing was denied November 5, 1981. Bird, C. J., did not participate therein.

*Assigned by the Acting Chairperson of the Judicial Council.