**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**ZAYRE CORP., Respondent.**

No. 27809.

United States Court of Appeals,
Fifth Circuit.

April 27, 1970.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Harold A. Boire, Dir., Region 12, N.L.R.B., Tampa, Fla., Morton Namrow, Atty., N.L.R.B., Washington, D. C., for petitioner.

Stuart Linnick, Sidney S. Wolchok, New York City, John W. Boult, Tampa, Fla., for respondent.

Before JOHN R. BROWN, Chief Judge, COLEMAN and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge: ·

In this case for enforcement of the Board's order against Zayre Corp., the only important and difficult questions presented relate to a finding of a § 8(a) (5) violation—refusal to bargain.[1] The central issue raised here is the extent to which the purchaser of the assets (Zayre) of a retail discount store is bound by the bargaining obligations of its predecessor in interest (Masters). More particularly, the question is raised whether (i) this particular asset purchaser is a "successor", (ii) whether the Board was justified in its finding that the bargaining unit of the original owner of the assets was initially appropriate, and (iii) whether the original unit became inappropriate because of changes instituted by the buyer.

In this particular case we believe that the Board's conclusion that the buyer was obligated to bargain was justified. Zayre was a successor and the unit was appropriate. The § 8(a) (5) order, as was that ·for § 8(a) (1) and (3), was supportable and is enforced.

## I.

### A. Masters Operations

This case involves a discount department store located on 7th Street, Miami, Florida. This particular store was originally owned by Masters, Inc. and was one of three such stores operated by Masters in the greater Miami area. Like many discount stores, Masters leased certain product lines to others. For example, Rockover Brothers operated a men's department, Lady Rose, Inc.. operated a women's wear department, and American Snack Bar operated the snack bar. These operations were, however, all carried on in the name of Masters, and the customers were unaware whether they were dealing with Masters or a lessee department operator.

This appearance of oneness was maintained basically through Masters' contractually reserved right to control the operations of its licensees. Of particular relevance here is Masters' expressed right to control the personnel policies and the personnel themselves of the licensees. Such power was given to Masters through its contracts with these licensees, but the occasions for the exercise of the power were few.

In October, 1962 Masters had a collective bargaining agreement with the Teamsters. This agreement covered the 7th Street store but included only the employees of Masters and excluded the employees of the licensees. Neither Masters nor the Teamsters thought the agreement covered more than the direect employees of Masters. Moreover, there was no evidence that the Teamsters ever

---

I. The § 8(a) (1) and (3) holdings are run-of-the-mill problems.

attempted to have the employees of the licensees included under the agreement.

In 1966 the Union [2] petitioned for an election to determine whether it would be certified as the exclusive bargaining representative for Masters' direct employees. Masters objected to the limitation of the unit to its direct employees and contended that the only appropriate unit was the whole store—direct employees and employees of licensees. The Regional Director found, however, that because of the prior bargaining history with the Teamsters and the failure of Masters to exercise its contract rights over the personnel policy of the licensees, the more appropriate unit was Masters' direct employees. The Board affirmed this decision. The election was held. And the Union was certified as the exclusive bargaining agent for the direct employees of Masters in this store.

There was no collective bargaining agreement entered into—the Union failed to request a bargaining meeting until June 24, 1966—and in the summer of 1966 Masters, which was being operated by a creditors' committee under a Chapter XI bankruptcy, sold its operating assets at this particular store to Zayre Corp.

### B. Zayre's Operations

Zayre continued to maintain the discount store operation at the site. It employed 95% of the persons employed by Masters and retained the practice of leasing out the operations of certain departments. There were, however, significant changes in the operation of the store upon Zayre's takeover.

First, Zayre changed the relationship between the local store and the rest of the Zayre chain from what the relationship had been between the store and the Masters chain. Under Masters the store had been operated basically as an independent unit. The store manager had virtual autonomy over many person-

nel and pricing decisions. The Miami stores maintained their own purchasing departments, and they also operated their own credit or revolving charge program for customers. Under Zayre the store was a fully integrated part of a national chain. All purchasing was done through central offices. All personnel policy was set, including wages and other working conditions, by the national office. All bookkeeping and accounting records and operations were maintained in a central office, and the pricing system was also modified. In addition, product lines were changed somewhat and all delivery services were discontinued.

Secondly, the takeover by Zayre modified significantly the relationship between Zayre, as an entity, and the employees of the licensees. Zayre operated under a policy of full control of the personnel operations of the licensees. Unlike Masters, Zayre operated a central hiring system for its own direct employees as well as employees of its licensees. It had complete control over hiring and firing of employees. All employees, both direct employees and employees of the licensees, were paid directly from its central office with its own payroll checks. A uniform policy applicable to both kinds of employees was maintained for vacation, sick leave and health and other insurance programs.

### II.

### The § 8(a) (1) and (3) Matter

In addition to these general changes, which are relevant to the questions of "succession" and appropriateness of bargaining units, Zayre made one very the § 8(a) (3) violation. It discharged Albert Drangle, who had been a salesman for Masters in the major appliance department for approximately 10 years and was the Union organizer and shop steward.

---

2. Retail, Wholesale & Department Store Union.

On the day following Zayre's takeover of the store Drangle questioned Zayre's personnel director concerning the continuation of a 40-hour work week in the store. During the conversation he identified himself as a spokesman for the Union and was promptly told that Zayre "had no union" and that employees would be given their work schedules by the manager. He soon became aware that some changes had indeed been made. Upon Drangle's return to work he found his card was not in the rack and went to the personnel office. He was there told that Zayre was discharging him because his earning rate under Masters was higher than Zayre's policy would afford. He was told that it was Zayre's policy to discharge any employee that would have to take a substantial cut in wages due to the takeover. Zayre's personnel manager was adamant in his refusal to continue Drangle's employment even though Drangle offered to work at any lower salary rate.[3] In addition, during this conversation, Drangle was told that "we don't have anything to do with unions around here."

■ On the basis of this record it is clear that there was substantial evidence to support the Board's findings. The inferences drawn and credibility choices made by the Board were for it and not for this Court. NLRB v. Curtis Manufacturing Co., 5 Cir., 1970, 421 F.2d 1335, 1337; NLRB v. The Great Atlantic & Pacific Tea Co., 5 Cir., 1969, 406 F.2d 1173. Thus, the Board's order concerning the findings of § 8(a) (1) and 8(a) (3) violations must be enforced.

## III.

### Zayre As Successor

■ The premier question in determining Zayre's § 8(a) (5) obligation to bargain is the effect of the sale of assets on the employees' rights under the certification. The answer is largely found in the doctrine of "succession of employers", which implements the policy of the statute by preventing a change in employers, whether by merger or asset acquisition, from in itself affecting employee rights.[4] John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898; United States Gypsum Co. v. United Steelworkers, 5 Cir., 1967, 384 F.2d 38, cert. denied, 1968, 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832. The acquiring employer is the successor to the obligations of his predecessor if there is continuity in the business operation. "The crucial question in determining if the certification is binding on the successor employer is whether the employing industry remains essentially the same after the transfer of ownership." NLRB v. Auto Ventshade, Inc., 5 Cir., 1960, 276 F.2d 303, 304; NLRB v. Valleydale Packers, Inc., 5 Cir., 1968, 402 F.2d 768.

Here the Board found that Zayre was a successor and was hence bound by the certification. In reaching this conclusion the Board relied to a great part on Zayre's continued operation of a dis-

---

3. It was highly disputed whether Drangle would in fact have to take a pay cut. Apparently, Zayre was under the impression that he was earning substantially more than he had in fact earned. They contended that he had earned $9,000 to $10,000 per year under the Masters pay scale—commissions plus base pay—but would only earn approximately $7,000 under their system. He contended, however, that he had only earned $6,800 under the Master program.

4. The reason for this rule was set forth by the Sixth Circuit in its frequently cited opinion in NLRB v. Colten, 6 Cir., 1939, 105 F.2d 179, 183:

"It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace. *. * * It needs no demonstration that the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about a change of ownership in the employing agency."

count department store on the very premises of the Masters store. To the purchasing, shopping public it was essentially the same as before except for a new name. Additionally, the Board relied on the showing that there was a continuation of the same types of product lines, departmental organization,[5] employee identity and job functions.[6]

Despite this continuity in the business and continuity of employment, Zayre argues that it should not be bound by the certifications because of the changes in the organizational management of the store. It argues that there is no continuity because of the change from a localized organization to an integrated national organization. This argument relies on NLRB v. Alamo White Truck Service, Inc., 5 Cir., 1959, 273 F.2d 238.

It is true that in *Alamo White* this Court held that a change from a large national employer to a small local one prevented the small transferee from being bound as a successor by the prior bargaining obligations of the transferor.[7] We do not believe, however, that *Alamo White* compels a rejection of the Board's conclusion here.

To begin with the change in *Alamo White* was from a large national organization to a small business with direct owner participation. The total number of employees was reduced—only eight of the previously employed 12 mechanics were reemployed—and with the discontinuation of the parts department, a substantial portion of the prior operation was eliminated. Here there was only a change in the type of internal organization. Both Masters and Zayre were large national companies. Moreover, the number of employees [8] and the basic size of the operation stayed the same.

Second, and more important, in *Alamo White* there was a change in the type

---

5. It is true that there were some relocations of departments, some departments were discontinued, and there were shifts both ways from owner to lessee operated departments and vice versa. Nevertheless, the basic organization stayed the same including the managerial policy of selective determination of departmental operation by owner or lessee.

6. There was also a substantial identity of employees, 95% of Masters employees, including the supervisory staff, were retained as Zayre employees. Moreover, the employees who were retained on Zayre's payroll incurred no substantial break in the continuity of their employment and received no severance pay from Masters. With respect both to employee shifts and departmental shifts (note 5, *supra*) we regard the elaborate, tabular analysis in Zayre's briefs to be of no real significance.

7. In that case we said:
   "We regard the employee-employer relationship as a most important element in determining whether there is sufficient continuity between two employing enterprises to justify enforcing an NLRB order against a company that was not a party to the original proceeding that generated the certification. The employee-employer relationship in the operation of Alamo was materially different from the employee-employer re-

lationship in White Motor Company, not just because of a difference in the number of employees or in the turnover, but because the interaction of the employee group with the management of Alamo was completely changed. We mean by this, the difference between the close personal relationship of management and workers characteristic of a small, local business, existing in this case as the record shows, and the disembodied relationship of workers to top management not uncharacteristic of a large corporation when branch workers must accept policies fixed by some far-off head office."
*Alamo White, supra* at 242.

8. In *Alamo White* the Court also noted that none of the employees of the small transferee belonged to the Union and that to require the transferee to bargain with it would be "something less than carrying out the purpose of a statute intended to enable employees to select bargaining agents of their choice to deal with their employer." *Alamo White, supra,* at 242. See also NLRB v. United Industrial Workers of Seafarers, 5 Cir., 1970, 422 F.2d 59; NLRB v. John Stepp's Friendly Ford, Inc., 9 Cir., 1964, 338 F.2d 833. But see, K. B. & J. Young's Super Markets, Inc. v. NLRB, 9 Cir., 1967, 377 F.2d 463.

of business being done. White Motor Co., the transferor, engaged in the manufacture, sale, and repair of trucks. Apparently, it depended on the sale of a large number of units to a small number of buyers. On the other hand, Alamo White Truck Service, the transferee, was primarily a service operation and its sales under franchise from White were local and retail. Here both Zayre and Masters operated the same kind of business. Thus there was no change in the "employing industry". NLRB v. McFarland, 10 Cir., 1962, 306 F.2d 219, 220. See Oil, Chemical & Atomic Workers Intern. Union, Local 4–243, AFL-CIO v. NLRB, 1966, 124 U.S.App.D.C. 113, 362 F.2d 943; Overnite Transportation Co. v. NLRB, 4 Cir., 1967, 372 F.2d 765, cert. denied, 1967, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101; NLRB v. Armato, 7 Cir., 1952, 199 F.2d 800.

Whether significant, or decisive, changes in internal organizational practices or policies might have a critical bearing on the appropriate unit, they did not affect the nature of the operations as that of a retail discount house, whether under Masters' or Zayre's name. The Board's conclusion that Zayre was the successor to Masters' obligations to bargain was clearly justified.

## IV.

### The Appropriate Unit

Zayre also attacks the validity of the certification itself by contending that the bargaining unit [9] designated in the prior representation proceeding is not appropriate.[10] The complaint is the exclusion of the employees of the licensees from the unit, the inclusion only of direct employees. Zayre's attack is two pronged. First, Zayre, as though in the name of Masters, argues that the Masters unit was inappropriate because Masters was a joint-employer of the employees of the licensees and under prior Board rulings all workers in a store were considered to have such a close community of interest that the only appropriate unit was a store-wide unit. Second, it argues that the changes instituted by it in accordance with its managerial policies subsequent to the transfer made the unit inappropriate by continuing the limitation to Zayre's direct employees.

It is undoubtedly true that the Board's unit determinations in the retail sales industry generally and in discount department stores in particular have appeared to be somewhat erratic. See Hall, The Appropriate Bargaining Unit: Striking a Balance Between Stable Labor Relations and Employee Free Choice, 18 Wes.R.L.Rev. 479, 512–18 (1967); Note, The Board and Section 9(c) (5): Multilocation and Single-location Bargaining Units in the Insurance and Retail Industries, 79 Harv.L.Rev. 811, 828 (1966). Much of this may well be traced to the very nature of the problem, and the practical necessity that the Board be accorded a great deal of latitude in making unit determinations because of the many and varied factors that can

---

9. The bargaining unit was described in the 8(a) (5) order as "all full-time and regular part-time employees employed by the employer at its discount department store at 3825 N.W. 7th St., Miami Florida; including the employees of its subsidiaries Houseware Corporation and Zayre of Florida, Inc., but excluding all other employees, including casual employees, office clerical employees, lease department employees, guards and supervisors as defined in the Act."

10. This § 8(a) (5) proceeding is the only opportunity for the employer to challenge the Board's ruling as regard to the appropriateness of the unit. By post-argument memoranda it is agreed that Masters preserved its objections to the appropriateness of the unit and that Masters would have the right to challenge a § 8(a) (5) charge on that ground. Thus both the records of the § 8(a) (5) proceeding, which related to Zayre's organizational modifications and their effect on the unit, and the representation proceeding are relevant here and were reviewed by the Court. See Electra Mfg. Co. v. NLRB, 5 Cir., 1969, 408 F.2d 570.

appropriately go into this decision.[11] See Gallenkamp Stores Co. v. NLRB, 9 Cir., 1968, 402 F.2d 525, 530; Neuhoff Bros. Packers, Inc. v. NLRB, 5 Cir., 1966, 362 F.2d 611, cert. denied, 386 U.S. 956, 87 S.Ct. 1027, 18 L.Ed.2d 106.

It is also true that the Board has often found that a store-wide unit was appropriate for a discount department store—a unit including both direct and employees of licensees. This has been especially true when the Board has found that the employer exercised or had the potential to exercise substantial control over the employment practices of the licensees and was in practical effect a joint-employer. See e. g., United Mercantile, Inc., 171 N.L.R.B. No. 103 (1969); Thriftown, Inc., 161 N.L.R.B. No. 603 (1966). Just as the Board recognized in this order,[12] it may be that at the time of the transfer here a store-wide unit may have been appropriate. But the fact that one unit is appropriate does not necessarily mean that all other units are inappropriate. NLRB v. Puritan Sportswear Corp., 3 Cir., 1967, 385 F.2d 142, 143. Indeed, as the Fourth Circuit phrased it, "In many cases there is no 'right' unit, and the Board is faced with alternative appropriate units," NLRB v. Quaker City Life Ins. Co., 4 Cir., 1963, 319 F.2d 690, 693. And NLRB v. Davis Cafeteria Inc., 5 Cir., 1966, 358 F.2d 98, after remand, 1968, 396 F.2d 18, does not argue to the contrary.

Such was the case here. Masters had established, at least in a limited way, a practice of bargaining for only its direct employees. Thus a bargaining history, one of the factors in determining appropriate bargaining units, had been established.[13] See Hall, *supra*, at 497. Moreover, although Masters had the contractual authority to exercise substantial control over the employment practices of the licensees, this control was never exercised. Whatever the contractually retained right might do on common law or tort principles to the employment relation in fact the persons working for the licensees of Masters were neither hired, paid, disciplined or fired by Masters. Thus, the Board's decision that as to Masters the unit should be confined to direct employees of Masters was fully within the Board's discretion.

Zayre, however, contends that the changes it has made in the organization and management of the store have resulted in the direct exercise of control over the employees of the licensees, their wages, hours, and other working conditions, and that no prior bargaining history existed as to it and thus that the unit could no longer be appropriate. Considering the policies of the Act, which accord rights to the employees in the unit[14] for changes instituted by the successor to have any effect upon the prior certification, the successor would have to demonstrate that the changes had destroyed the identity of the existing unit.

Here the effect of Zayre's policies was to bring all workers in the store under its effective direction and control.

11. There "are so many good reasons one may easily find for the propriety of any particular unit's serving as the bargaining agency that anyone attacking the appropriateness of a certified bargaining unit wages an uphill fight." NLRB v. Schill Steel Products, Inc., 5 Cir., 1965, 340 F.2d 568, 574. See also Spartans Indus., Inc. v. NLRB, 5 Cir., 1969, 406 F.2d 1002, 1005.

12. "If the various changes instituted by Zayre have not resulted in a loss of identity of the Masters unit, it continues to be an appropriate unit for bargaining even though an enlarged unit including all store employees may also be appropriate." Zayre Corp., 170 NLRB No. 190 (1968).

13. Although this bargaining history occurred prior to certification and was not necessarily determinative, it certainly was a persuasive factor the Board could assay. See, NLRB v. Porter County Farm Bureau Cooperative Ass'n, Inc., 7 Cir., 1963, 314 F.2d 133.

14. All agree that body counts are irrelevant. Changes in the identity of the individuals in a unit do not extinguish its statutory status as the exclusive bargaining representative.

Those working for licensees therefore had a common interest with the direct employees. But while the changes instituted by a successor may increase the number of employees having the same community of interest, such enlargement cannot be given the effect of depriving the employees who formerly were in an appropriate unit of the benefits of certification. Under any such result the Act's demand for stability of labor relations would be greatly undermined. See Neary, The Union's Loss of Majority Status and the Employer's Obligation to Bargain, 36 Texas L.Rev. 878 (1958). Thus, in this situation persons (or their successors) who, had Masters continued operations, would be represented by the Union until its certification was lawfully terminated or extinguished, would find themselves without statutory bargaining rights.

■ The changes here did not destroy identity. The employment functions of the workers in the existing unit remained the same. The employees remained the same. Only Zayre's organizational policies changed.

■ Some tag ends remain. Under a strictly logical application of the Board's unit determination it would appear that the unit would be "direct" employees, and any non-discriminatory changes in departmental operation from owner to licensee will operate to exclude from the unit the persons employed by such licensee. But such logic would produce a result that would be inconsistent with the policies of the Act. First, the unilateral act of an employer should not deprive employees of their right to bargaining representation. Secondly, the transfer of employee functions to licensee or other subcontractors is normally a bargainable issue. See Fibreboard Paper Products Co. v. NLRB, 1964, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233; NLRB v. Rockwell-Standard Corp., 6 Cir., 1969, 410 F.2d 953. And, although we do not decide whether bargaining was required here, no such bargaining took place.

Thus employees transferred from a direct-employee department to a licensee department remain in the unit. Of course, whenever during the life of the certification Zayre shifts from a licensee operation to a direct owner operation the workers automatically become members of the unit. Zayre must bargain with them through the Union. The same is true as to the employees of Zayre's two wholly controlled subsidiaries, Zayre of Florida and Housewares, Inc. They constitute direct employees of Zayre's and are within the unit. NLRB v. M. P. Building Corp., 5 Cir., 1969, 411 F.2d 567.

We do not rule out the possibility that in some succession cases the successor will so modify the prior unit that its identity will be destroyed, with the result of the transferee not being bound as a successor. But this is not such a case.

Enforced.