768 F.2d 1463
 119 L.R.R.M. (BNA) 3473, 120 L.R.R.M. (BNA) 2865,
248 U.S.App.D.C. 30, 103 Lab.Cas. P 11,557
 UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,
AFL-CIO, LOCAL 152, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Spencer Foods, Inc., Intervenor.
SPENCER FOODS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Food and Commercial Workers International Union,
AFL-CIO, Local 152, Intervenor.
 Nos. 84-1077, 84-1126.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 16, 1985.
Decided July 26, 1985.
As Amended Aug. 15, 1985.
 
 Petitions for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Peggy A. Hillman, Chicago, Ill., with whom Eugene Cotton, Chicago, Ill., and George R. Murphy, Washington, D.C., were on brief, for United Food and Commercial Workers Intern. Union, AFL-CIO, Local 152, petitioner in No. 84-1077 and intervenor in No. 84-1126. Carol Clifford, Washington, D.C., entered an appearance, for Local 152 as intervenor in No. 84-1126.
 John J. McGirl, Jr., Minneapolis, Minn., with whom Lisa M. Hurwitz, Minneapolis, Minn., was on brief, for Spencer Foods, Inc., petitioner in No. 84-1126 and intervenor in No. 84-1077.
 Barbara A. Atkin, Atty., N.L.R.B., Washington, D.C., with whom Wilford W. Johansen, Acting Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Patrick J. Szymanski, Atty., N.L.R.B., Washington, D.C., were on brief, for respondent.
 
 
 1
 Before WRIGHT and TAMM, Circuit Judges, and OBERDORFER,* District Judge.
 
 
 2
 Opinion for the court filed by District Judge OBERDORFER.
 
 
 3
 OBERDORFER, District Judge.
 
 
 4
 This case is before us on the consolidated petitions of the United Food and Commercial Workers International Union, AFL-CIO, Local 152 ("the Union") (No. 84-1077) and Spencer Foods, Inc. ("SF") (No. 84-1126) to review and set aside or modify an order of the National Labor Relations Board ("the Board"), reported at 268 N.L.R.B. 1483 (1984). We address each petition separately below.
 
 I.
 
 5
 The Union in this case charged, inter alia, that SF violated Sections 8(a)(5) and (1) of the National Labor Relations Act ("the Act"), 29 U.S.C. Sec. 158(a)(5) and (1) (1982),[1] by refusing to recognize or bargain with the Union following the closing of SF's Spencer, Iowa plant ("the Spencer plant") and the transfer of SF's stock to a new owner, Land O'Lakes, Inc. ("LOL"). Contrary to the recommendation of the Administrative Law Judge ("ALJ"),[2] the Board rejected the Union's contentions on this issue, on the ground that, under the "successorship" doctrine, there was no substantial continuity in business operations at the Spencer plant following the stock transfer and ensuing operational alterations. Spencer Foods, Inc., 268 N.L.R.B. 1483, 1483-85 (1984). The Board, accordingly, dismissed the section 8(a)(5) allegations in the complaint. The Union, in No. 84-1077, seeks reversal of the Board's ruling on this issue.
 
 Facts
 
 6
 SF is engaged in the slaughter of beef cattle and the fabrication of beef products. The company was incorporated in 1952, and for a lengthy period of time conducted operations solely at the Spencer plant. In 1970, SF acquired another major production facility, in Schuyler, Nebraska. Also in the early 1970's, SF acquired four additional production facilities that were related to, but much smaller than, the main operations in Spencer and Schuyler.[3]
 
 
 7
 The Union's representation of SF employees has been limited to the production and maintenance employees at the Spencer plant. From SF's inception until 1971, SF and the Union had readily negotiated a series of collective bargaining agreements with respect to these Spencer plant employees. In 1971 and 1974, however, SF and the Union encountered considerable difficulty in reaching agreement due to a new and strong effort by SF to limit the wages and benefits of its Spencer production and maintenance employees to a level below the industry pattern. On each occasion, agreement was reached only following a strike of several months' duration (18 months in 1971, 3 months in 1974). In 1977, difficulties arose again, but this time no resolution was achieved. With the approach of the expiration--on October 31, 1977--of the then-pending collective bargaining agreement, SF indicated that it desired a one-year wage and benefit freeze. It stated to the Spencer employees--all of whom voluntarily belonged to the Union[4]--that their failure to accept the proposal would result in the suspension of work at the plant and that SF would regard the work suspension as due to a "labor dispute." 268 N.L.R.B. at 1495. The Union rejected the proposal pursuant to a vote of its members. On October 31, 1977, SF Chairman, President and Chief Executive Officer Gerald L. Pearson announced to Spencer employees that "we are closing the plant and will place it up for sale." Id.
 
 
 8
 In the meantime, beginning in the fall of 1977, even before the closing, SF and LOL had been in touch with each other and had commenced negotiations with regard to the possible sale of SF's Spencer plant. Indeed, the ALJ found that at the time of the closure of the Spencer plant, it was SF's desire "to sell all [of SF's plants] but the [relatively more] successful Schuyler plant." Id. Nonetheless, the ALJ also found, based on SF's own statements, that despite SF's interest in selling off some of its plants, SF had "no fixed intent ... to permanently sever [the Spencer plant] employees at plant closure." Id. at 1509.[5] In fact, within 15 days of the closing, Pearson wrote a letter to LOL proposing not the sale of particular SF plants, but rather the sale of SF itself, in its entirety, as a going concern.
 
 
 9
 LOL continued to express interest in acquiring only certain facilities--namely, the Spencer and Schuyler plants--and in January of 1978 offered to buy those plants alone for $10 million in a simple assets purchase. However, it became apparent that an assets purchase would have required either SF or LOL to pay a substantial federal tax based on the recapture of certain tax benefits that SF had previously claimed. Therefore, the assets purchase plan was abandoned and SF and LOL ultimately arrived at an alternative arrangement: SF and LOL agreed that LOL would simply acquire all of SF's stock, subject to certain special provisions ensuring the eventual disposition of all the properties but the Spencer and Schuyler plants. The tax problem was thus avoided by expressly having the Spencer and Schuyler operations remain under the continuing corporate ownership and control of SF, while LOL gained control of all of SF's stock.
 
 
 10
 SF and LOL apparently reached agreement on this alternative arrangement by March of 1978. A certain delay ensued in consummating the agreement because LOL initially sought to effect the stock purchase through a new LOL subsidiary, Mid-West Cattle Producers Cooperative. By September of 1978, however, this effort was aborted and LOL instead purchased the bulk of the stock directly through a friendly tender offer, which was concluded by October 27, 1978.[6]
 
 
 11
 Following LOL's acquisition of SF's stock, a number of alterations--meticulously documented by the ALJ--were made in SF's corporate and operational structure. Basically, SF remained as a corporate entity with headquarters located at Spencer, Iowa, but its articles of incorporation were amended to allow it to operate as a farmer cooperative. The members of SF's board of directors were replaced by LOL officials, but Pearson remained as President of SF and gained the additional position of vice president of LOL's new "beef division"--i.e., the Spencer and Schuyler operations. Pearson also remained as CEO of SF and remained in charge of day-to-day operations, though "subject to goals, objectives, and financial policy as determined by LOL." Id. at 1498. Cattle purchases from LOL's cooperative farmer members were indicated, but local cattle purchases also continued.
 
 
 12
 Actual operations at the Spencer plant resumed on February 26, 1979. The ALJ's findings indicate that at least seven of 19 supervisors and managers, including the plant supervisor in charge of production, were individuals who were employed by SF prior to the closure.[7] Production at the plant was reduced from two shifts to one shift, and operations were changed from part kosher/part non-kosher to totally kosher (with an accompanying adjustment in SF's customer list). An investment of $1.3 million was made on physical plant improvements--some of which were "cosmetic," e.g., plastering, and others of which were of more significance, e.g., new equipment. Although "[s]ome jobs were eliminated and some combined," id. at 1501, the ALJ found that "[b]asically, the production process was the same [as that prior to the closure]," id.
 
 
 13
 By March of 1978, when SF and LOL agreed in principle to the transfer of SF's stock to LOL, accounts of the negotiations and the planned reopening of the Spencer plant had appeared in the press. Lowell Lauritsen, president of the Union, sent a letter to appropriate SF and LOL personnel taking note of the press accounts and stating that "the employees of [the Spencer] plant are available for return to work upon notice." Id. at 1497. Lauritsen's letter further stated that "[w]e hereby request an opportunity to meet with the appropriate representatives of management to resume negotiations with respect to the terms and conditions of employment at the plant." Id. This letter, as well as subsequent, similar letters from Lauritsen to SF and LOL, received no response until November 17, 1978. On that date, an appropriate LOL official responded, as stated by the ALJ, that "LOL did not currently have employees at Spencer, Iowa, nor did it 'contemplate the hiring of employees at such location.' " Id. at 1498. The letter also indicated that "S.F. had been requested to respond" to the Union inquiry. Id. A December 13, 1978 letter from an appropriate SF official then confirmed the contemplated reopening of the Spencer plant, and indicated that " 'applications will be taken from all interested persons, including both former employees of Spencer Foods at the Spencer, Iowa operation and other interested persons.' " Id. With respect to the individuals who were employed at the Spencer plant prior to the closure, however, the letter flatly stated that those employees had been " 'terminated,' " id., and that there had been no production employees at the Spencer plant since the date of closure. The letter explained that because of this asserted "termination"
 
 
 14
 ... and the fact that the plant will be opened as a new operation for the benefit of the Land O'Lakes farmer owners, we must reject your claim and inform you that there is no legal obligation to bargain with your Union over terms and conditions of employment when the Spencer plant opens.
 
 
 15
 Id. SF, accordingly, rejected Lauritsen's request for a meeting.
 
 
 16
 One month later, in January of 1979, SF initiated the hiring of a new workforce for the soon-to-be-reopened Spencer plant. Though SF had represented to the Union that applications "would be taken from all interested persons, including ... former Spencer [plant] employees," id., only a very small proportion of former Spencer employees were eventually hired. As set forth more fully in Part II below, the Union charged, and the ALJ and Board have agreed, that SF--in restaffing the plant--used a set of hiring criteria discriminatorily designed to keep the former, unionized Spencer employees in the new workforce to a minimum, and thus keep the Union out of the plant. We focus on this particular allegation in Part II. For the purposes of this Part, we note that at the same time that the restaffing was taking place, SF continued to refuse to recognize or bargain with the Union with respect to either the recall of former Spencer employees or the terms and conditions of employment at the reopened plant.
 
 Conclusions by the ALJ
 
 17
 Based on these facts, the ALJ concluded that SF had violated Sections 8(a)(5) and (1) of the Act by "withdrawing recognition from the Union in December 1978," id. at 1511, by "failing and refusing to bargain with the Union [thereafter] concerning the recall of laid-off bargaining unit employees," id., and by "unilaterally changing wage rates, benefits and other terms and conditions of employment of the bargaining unit employees and by unilaterally establishing conditions and criteria for the eligibility of recall of bargaining unit employees since January 1979," id. In support of this conclusion, the ALJ's analysis explained that
 
 
 18
 [a]lthough this case is factually complicated by the factors of a hiatus in operation at Spencer and nonactive employment of the former employees as well as other changes, I conclude that the same continuing employing entity existed throughout. I conclude that there was no severance in employing entities, nor substitution of employers, but that S.F. remained, despite new ownership and management, as the same employing entity.
 
 
 19
 Id. at 1509. With respect to the status of the employees at the plant, the ALJ stated that
 
 
 20
 I conclude that when LOL assumed ownership and control of S.F. it assumed ownership and control of an employing entity of which the relationship to its past unit employees at Spencer remained the same, i.e., it continued to remain the employer of unit employees who had been laid off for the purpose of a sale of the plant.... I conclude that in December 1978 when recognition was withdrawn, S.F. was back in the same posture as an employer of the Spencer unit employees as it was on the day it decided to close the plant but that, under new ownership, the decision which precipitated the layoffs, i.e., to sell the plant, had been rescinded and replaced with a decision to resume unit work at Spencer.
 
 
 21
 Id. at 1509-10. With respect to the operations at the reopened plant, the ALJ found that
 
 
 22
 [w]hen the Spencer plant resumed operations, the unit work resumed. The changes in the operation of the Spencer plant, while obviously not cosmetic, were not changes of the essential nature of unit work, nor of the essential operations of the Spencer plant. Basically, the same work continued for the same corporate entity at the same place, with the same or substantially similar procedures, processes and machinery, serving the same customers or same type of customers with much the same sources of supply.
 
 
 23
 Id. at 1509.
 
 Conclusions by the Board
 
 24
 The Board, by contrast, found no violation of Section 8(a)(5). The Board characterized the ALJ's finding that SF remained the "same employing entity" before the closing and after the reorganization as relying "primarily on the stock transfer method by which [LOL] acquired [SF]." Id. at 1484 n. 5. The Board objected that "[a]s set forth in detail by the judge and summarized herein, the record reveals much more than the mere substitution of one owner for another through a stock transfer within the context of an ongoing enterprise." Id. at 1485 n. 5. The central factor, in the Board's view, was "whether there [was a] substantial continuity of the business enterprise" before the closing and after the reopening, as evaluated in a traditional "successorship" analysis. Id. at 1484-85. The Board's own analysis in this regard, however, was extremely brief:
 
 
 25
 ... [W]e are convinced that the record compels a conclusion that the resumption of the Spencer Foods operation did not involve the "substantial continuity of the business enterprise" which would support the 8(a)(5) allegation. We first note that the hiatus in operations of the Spencer plant lasted for almost a year and a half. Additionally, Spencer Foods, Inc., as a corporate division of Land O'Lakes, was directed by substantially new top management and plant supervisory personnel. Four of the six Spencer Foods facilities were eliminated. The size of the work force at Spencer was drastically reduced due to a change from a two-shift to a one-shift operation and the elimination of the nonkosher product line. As a result [SF] no longer supplied certain of its former customers and it added new customers. A series of other changes further militate against a finding of continuity between the original Spencer Foods operation and its reemergence as a new corporate subsidiary of Land O'Lakes. Land O'Lakes directed that efforts be made to secure supplies from its own members. It thereby began to realign [SF] as part of its large agricultural cooperative. Land O'Lakes made further capital investment in this subsidiary by providing approximately $1,300,000 beyond the initial purchase price for new equipment purchases and other substantive plant improvements. As a result of these changes production steps and job assignments were substantially modified.
 
 
 26
 In these circumstances, we find that [SF] as a subsidiary of Land O'Lakes is a new and independent enterprise and is not a successor to Spencer Foods, Inc. Accordingly, we dismiss the 8(a)(5) allegations in the complaint.
 
 
 27
 Id. at 1485 (footnote omitted).
 
 Analysis
 
 28
 We must uphold an order of the Board unless, reviewing the record as a whole, we conclude that its findings are not supported by substantial evidence, General Teamsters Local Union No. 174 v. NLRB, 723 F.2d 966, 970-71 (D.C.Cir.1983), or that it erred in applying the law to the facts at issue, see id. at 971. Where the Board has disagreed with the ALJ, as occurred here, the standard of review with respect to the substantiality of the evidence does not change. Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); General Teamsters, supra, 723 F.2d at 971. However, the Supreme Court has recognized that
 
 
 29
 evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.
 
 
 30
 Universal Camera Corp., supra, 340 U.S., at 496, 71 S.Ct. at 468. Subsequent cases have made clear that "[t]he findings and decision of the [ALJ] form an important part of the 'record' on which [the] judgment of substantiality is to be based," International Brotherhood of Teamsters, Local No. 310 v. NLRB, 587 F.2d 1176, 1180 (D.C.Cir.1978), and that the Board, when it disagrees with the ALJ, "must make clear the basis of its disagreement ...," General Teamsters, supra, 723 F.2d at 971.
 
 
 31
 The legal principles to be applied to the question on the merits have been plainly elaborated by this and other courts. Even an entirely new employer at a given place of employment may be required to recognize and bargain with a union that has previously been recognized or certified as the bargaining representative of the employees at that place of employment if there remains a "substantial continuity of the employing industry," Miami Industrial Trucks, 221 N.L.R.B. 1223, 1224 (1975); see NLRB v. Burns Int'l Security Serv., Inc., 406 U.S. 272, 279-81, 92 S.Ct. 1571, 1577-79, 32 L.Ed.2d 61 (1972); NLRB v. Zayre Corp., 424 F.2d 1159, 1162 (5th Cir.1970); 4 T. Kheel, Labor Law Sec. 17.03[a] (1982). In such circumstances, the new employer is deemed a "successor" to the prior one and may escape the duty to recognize and bargain with the union only if there is some genuine doubt as to whether the Union enjoys the support of the majority of the bargaining unit. See NLRB v. Burns Int'l Security Serv., Inc., supra, 406 U.S. at 278-81, 92 S.Ct. at 1577-79. In determining whether the requisite "substantial continuity of the employing industry" exists, courts and the Board typically look to a variety of factors, including--as recited by the Board itself in this case--such factors as "continuity in operation, location, work force, working conditions, supervision, machinery and equipment, methods of production, and product." 268 N.L.R.B. at 1485. We have recognized that the consideration of these factors is "highly fact specific," International Union of Electrical Workers (IUEW) v. NLRB, 604 F.2d 689, 694 (D.C.Cir.1979), and that the successorship determination must be based on "the totality of the circumstances." Id. However, we have also made clear that
 
 
 32
 [t]he essential inquiry is whether operations, as they impinge on union members, remain essentially the same after the transfer of ownership. See NLRB v. Zayre Corp., 424 F.2d 1159, 1162 (5th Cir.1970), cited with approval in NLRB v. Burns Security Services, Inc., [supra,] 406 U.S. at 281 [92 S.Ct. at 1579].
 
 
 33
 Id. (emphasis added). The focus of the analysis, in other words, is not on the continuity of the business structure in general, but rather on the particular operations of the business as they affect the members of the relevant bargaining unit. As recently noted by the Ninth Circuit Court of Appeals, "the touchstone remains whether there was an 'essential change in the business that would have affected employee attitudes toward representation.' " NLRB v. Jeffries Lithograph Co., 752 F.2d 459, 464 (9th Cir.1985) (quoting Premium Foods, Inc. v. NLRB, 709 F.2d 623, 627 (9th Cir.1983)) (emphasis added). Accord Saks & Co. v. N.L.R.B., 634 F.2d 681, 687 (2nd Cir.1980); NLRB v. Band-Age, Inc., 534 F.2d 1, 4-6 (1st Cir.), cert. denied, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976).
 
 
 34
 With these standards in mind, we turn to the Union's petition to reverse the decision of the Board on the "successorship" issue herein. It is worth noting, at the outset, that in this case, the same corporate entity that existed prior to the Spencer plant closing did continue to exist after the reopening of the Spencer plant, notwithstanding the transfer in the ownership of the corporation's stock, and notwithstanding the changes in the corporation's status and business operations. SF and LOL deliberately structured the transaction between them, as described above, so as to retain and continue SF's preexisting corporate identity. SF has reaped valuable tax advantages as a result. Here, on the other hand, SF, in support of the decision of the Board, seeks to deny any continuity with itself, by arguing that the same transaction somehow absolved it of its previously established duties with respect to the Union. This claim must be examined with special care. As in an analagous case before the Sixth Circuit Court of Appeals, SF
 
 
 35
 would have us hold that [it] still exists for tax purposes but does not exist for purposes of the labor [relationship with its] workers. We decline to so hold. A company seeking the substantial benefits of a tax [deduction] must accept the obligations arising out of the arrangement.
 
 
 36
 Miami Foundry Corp. v. NLRB, 682 F.2d 587, 589 (6th Cir.1982).
 
 
 37
 Thus, the fact that the "previous" employer remained in existence as a corporation is a relevant one within the totality of the circumstances here, see, e.g., TKB International Corp./Hendricks-Miller Typographic Co., 240 N.L.R.B. 1082 (1979); Tropinka's Country House, Inc., 235 N.L.R.B. 72 (1978), enforced, National Labor Relations Board v. Topinka's Country House, 624 F.2d 770 (6th Cir.1980), and the ALJ was not unjustified in noting this consideration. At the same time, the ALJ did not rest his analysis on this element alone, but also carefully addressed the significance of the remaining factual aspects of the suspension and resumption of operations. As stated by the Board, the record in this case does reveal "much more than the mere substitution of one owner for another through a stock transfer within the context of an ongoing enterprise." 268 N.L.R.B. at 1485 n. 5. Given that the transfer of corporate ownership in this case in fact rendered SF an integrated "subsidiary," 268 N.L.R.B. at 1485, of a much larger corporate organization, and given that the transfer was accompanied by an initial closure of the Spencer plant and some alteration of the business operation, the events at issue here plainly involved a broader form of business reorganization, and not a mere stock transfer. In determining whether SF's mandatory obligation to recognize the Union survived the reorganization of the business, therefore, it is necessary for the focus of the inquiry to center upon a detailed, factual analysis of whether there was a substantial continuity in the "employing industry," between the old Spencer operation and the new one. See, e.g., NLRB v. Hot Bagels and Donuts, Inc., 622 F.2d 1113, 1115-16 (2nd Cir.1980); NLRB v. DIT-MCO Inc., 428 F.2d 775, 779-81 (8th Cir.1970). See generally T. Kheel, supra, Sec. 17.04. The crucial question in this analysis, as noted, is whether an examination of the operations of the business "as they impinge on union members," IUEW v. NLRB, supra, 604 F.2d at 694, reveals an "essential change in the business operations that would have affected employee attitudes toward representation," Premium Foods, Inc. v. NLRB, supra, 709 F.2d at 627.
 
 
 38
 The Board's analysis first notes that "the hiatus in operations of the Spencer plant lasted for almost a year and a half." 268 N.L.R.B. at 1485. However, the Board offers no elaboration of how, in this case, the length of the hiatus may have affected employee attitudes toward representation. Meanwhile, the ALJ--whose familarity with this case was based not only on full briefing but also on twenty hearings throughout 1980--concluded, on the basis of detailed findings, that the hiatus did not weigh in favor of absolving SF of its duties with respect to the Union. The importance in a successorship analysis of the fact that a hiatus in operations occurred depends, of course, on the "totality" of facts in the particular case. The Board's own decisions indicate that in certain circumstances--which tend to involve bankruptcy, see, e.g., Blazer Industries, Inc., 236 N.L.R.B. 103, 105, 110 (1978); Cagles, Inc., 218 N.L.R.B. 603, 603, 605 (1975), or a finding that the employer had a fixed and enduring intention to dispose of the plant or close it permanently, see, e.g., Molded Fiber Glass Body Co., 182 N.L.R.B. 400, 402-03 (1970)--the occurrence of a lengthy hiatus may well weigh against the reimposition of bargaining obligations when operations are set to resume. See also Schmutz Foundry & Machine Co., 251 N.L.R.B. 1494, 1496-97 (1980) (discussing Molded Body Fiber Glass Co., supra ), enforced, 678 F.2d 657 (6th Cir.1982) (per curiam). We note that in such circumstances, employees naturally have slim, if any, expectations of recall, see, e.g., Molded Body Fiber Glass Co., supra, at 402, and their attitudes toward representation may well be affected adversely. Here, however, the ALJ explained that such was not the case. The ALJ explicitly found that SF was far from "moribund," 268 N.L.R.B. at 1509, and that the thrust of SF's effort was instead to "effectuate a sale of an ongoing business enterprise to LOL, i.e., a business which encompassed the resumed operations of the Spencer plant by S.F. [albeit] under new ownership." Id. The length of the hiatus resulted not from any "decision to dispose of the Spencer plant," id., but rather from the "negotiations for stock purchase," id., i.e., the ultimately aborted efforts by LOL to effect the stock purchase through the Mid-West Cattle Producers Cooperative. In the meantime, the ALJ found, the Spencer employees perceived their status not as terminated employees, but rather as only "temporary layoffs subject to recall," id.--a legitimate perception that "was the inherent result of S.F.'s past representations and news media disclosures of the imminent reopening of the plant." Id.; see infra at 1466 and note 5. Upon consideration of these well-supported findings by the ALJ, the Board's failure to note or explain any "disagreement" with these findings, and our own review of the entire record, we find that there is no "substantial evidence" to support the Board's apparent conclusion that the length of the hiatus itself had any substantial affect on employee attitudes toward representation.
 
 
 39
 Courts in other successorship cases have recognized, in addition, that
 
 
 40
 [w]hile the Board has sometimes relied on a substantial hiatus between [the suspension and the resumption of operations] in finding no successor obligation to bargain, it has done so only where the hiatus in operations is 'one of many factors pointing to such a substantial transformation in the nature of the predecessor's operations that a real question was presented, by the combination of circumstances, as to the employees' desires with regard to representation. United Maintenance & Manufacturing Co., Inc., 214 N.L.R.B. [529, 532] (1974).
 
 
 41
 NLRB v. Band-Age, Inc., supra, 534 F.2d at 5 (emphasis added) (quoted with approval in Schmutz Foundry & Machine Co., supra, 251 N.L.R.B. at 1496-97). In this case, apart from the hiatus, the Board's analysis does recite a number of changes in SF's status and operations that were instituted during the hiatus or upon the reopening of the Spencer plant. Again, however, the Board fails to explain how, in the face of the findings by the ALJ, these changes may have affected employee attitudes toward representation. Our own review of the record does not, moreover, disclose the existence of substantial evidence to support such a conclusion.
 
 
 42
 The first two elements of the Board's recitation of changes are illustrative. The Board notes that
 
 
 43
 "Spencer Foods, Inc., as a corporate division of Land O'Lakes, was directed by substantially new top management and plant supervisory personnel. Four of the six Spencer Foods facilities were eliminated."
 
 
 44
 268 N.L.R.B. at 1485. We first observe that because the focus of our analysis is on SF's operations as they "impinged on" the employees at the Spencer plant, the pertinent inquiry here must specifically address operations at the Spencer, Iowa plant, rather than the broad corporate structure of "Spencer Foods, Inc." in general. Therefore, the Board's comment about the fate of SF's four, smaller ancillary plants is irrelevant, in that there is nothing in the record to suggest that the disposition of these other facilities would have had any impact on the operations at the Spencer plant or on the representation attitudes of the Spencer employees. As to the change in supervisory personnel, it is true that some of the Spencer plant managerial and supervisory personnel, following the stock transfer, were wholly new, but it is also true that others remained the same or were merely moved to new positions. See supra at 1467 and note 7. The essential fact here is that while the Board asserts that a change in upper level personnel occurred, there is nothing in the Board's analysis explaining how these personnel changes effected any substantial transformation in the basic operations at the Spencer plant. Our own review of the record confirms the ALJ's finding that the "same work continued ... at the same place, with the same or substantially similar procedures, processes, and machinery...." 268 N.L.R.B. at 1509; see Saks & Co. v. NLRB, supra, 634 F.2d at 686. More specifically here, our review reveals no substantial evidence to support the Board's apparent conclusion that the upper level personnel changes effected any substantial transformation in the Spencer plant operations.
 
 
 45
 The same shortcomings infect the remainder of the Board's analysis. For example, the Board asserts that "[t]he size of the work force at Spencer was drastically reduced due to a change from a two-shift to a one-shift operation and the elimination of the nonkosher product line." 268 N.L.R.B. at 1485. The record shows that by far the bulk of the reduction in the size of the work unit resulted from the decision to have only one shift. Yet other courts have made clear that the mere reduction in the size of a work force does not affect the employer's obligations toward the Union, nor would it, by itself, transform operations in a substantial enough manner to affect the representation attitudes of the employees who remain. IUEW v. NLRB, supra, 604 F.2d at 695; NLRB v. Band-Age, Inc., supra, 534 F.2d at 5. As to the tasks that may have been eliminated due to the elimination of the nonkosher kill, there is nothing in the record to suggest that the nature of the kosher kill operation at the Spencer plant and the nonkosher kill at the Spencer plant were so divergent that the elimination of one would have caused a "substantial transformation" in operations. The evidence instead supports the ALJ's finding that, despite the elimination of the kosher kill, "[b]asically, the production process was the same." 268 N.L.R.B. at 1501.
 
 
 46
 The Board further remarks that as a result of the suspension of the nonkosher portion of the plant's production, "[SF] no longer supplied certain of its former customers and added new customers." Id. at 1485. However, the Board fails to explain how any adjustment that may have occurred in SF's customer lists affected, in any way, the production and maintenance employees in the performance of their tasks. The same is true with respect to the Board's observation that SF began to purchase some of its cattle from members of LOL's farmer cooperatives: the cattle, by the time they reached the production and maintenance employees at the Spencer plant, remained merely cattle. There is nothing to suggest that the production and maintenance employees handled the cattle any differently depending on their origin of purchase.
 
 
 47
 The Board's recognition, finally, that significant capital renovation and improvements occurred fails again to focus on the key question: whether operations were substantially transformed. The Board states in a conclusory fashion that "[a]s a result of these changes production steps and job assignments were substantially modified." Id. A review of the record confirms that, to be sure, some changes of this sort occurred. Some of the equipment used by the employees was newer. The number of men on the assembly-line "kill chain" increased. Id. at 1501. Certain operational changes arguably resulted in the slaughter of "more head per man." Id. But nothing in the record suggests that these limited improvements and adjustments resulted in a transformation of the plant's operations so substantial as to warrant withdrawing recognition of the Union. Our close review of the record reveals instead that the skills required of the vast majority of Spencer production and maintenance employees to perform their tasks, and the conditions in which they performed those tasks, remained essentially the same. As stated by the ALJ, "[t]he changes in the operation of the Spencer plant, while obviously not cosmetic, were not changes of the essential nature of unit work, nor of the essential operations of the Spencer plant." Id. at 1509; see Saks & Co. v. NLRB, supra, 634 F.2d at 686.
 
 
 48
 We have previously noted that "[a]lthough some internal organizational alterations may affect successorship obligations, not all changes will be of determinative significance." IUEW v. NLRB, supra, 604 F.2d at 694 (footnote omitted); accord NLRB v. Jeffries Lithograph Co., supra, 752 F.2d at 465-66. In this case, we find, in sum, after close review of the Board's analysis and the entire record herein, that there is no substantial evidence to support the conclusion that the operational changes contemplated for the Spencer plant during the hiatus and instituted upon the plant's reopening were so substantial as to affect employee attitudes toward representation. There is no substantial evidence in the record to support the Board's conclusion that SF was justified in refusing to continue to recognize or bargain with the Union. Accordingly, we reverse the decision of the Board to dismiss the Section 8(a)(5) allegations in the complaint, and remand this issue to the Board for further proceedings, including the fashioning of an appropriate remedy, in accordance with this opinion.
 
 II.
 
 49
 The Union also charged that when SF reopened the Spencer plant and hired a new workforce, it violated Sections 8(a)(3) and (1) of the Act, 29 U.S.C. Sec. 158(a)(3) and (1) (1982), by using hiring criteria that discriminated against the plant's former, unionized employees. On this issue, the Board--in agreement with the recommendation of the ALJ--ruled in the Union's favor. SF, in No. 84-1126, seeks review of this latter aspect of the Board's Order. Also, the Board, in No. 84-1126, has filed a cross-application for enforcement of its Order, which SF opposes.
 
 Facts
 
 50
 In January of 1979, SF began to hire prospective workers for the anticipated February 1979 resumption of operations at the Spencer plant. In doing so, however, SF--at the direction of certain LOL officials--developed and applied a special set of hiring criteria which, SF has contended, were objectively designed to enhance the productivity of its prospective workforce. Included among these criteria was a rule--referred to as the "antinepotism" rule--prohibiting the employment at any SF facility of more than one member of any immediate family. Other criteria required an evaluation of such factors as the employee's prior job stability, health, absenteeism, accident record, and disciplinary problems. Applicants who were former Spencer employees were judged on these latter criteria based exclusively on their records at the Spencer plant prior to closure. New applicants were evaluated according to their most recent employment.
 
 
 51
 Prior to the closing of the Spencer plant, there were 420 unit employees at the Spencer plant. As noted, one hundred percent of the employees were, voluntarily, members of the Union. About 50 percent of the employees were members of the immediate families of other employees at the plant. By the date on which the Spencer plant resumed operations, about 1100 individuals had filed applications for jobs at the plant, including approximately 250 former Spencer employees; of the 69 who were hired by that date, only 22 or 23 were former Spencer employees. Ultimately, approximately 2000 applications were filed, including approximately 300 from former Spencer employees; of the 200 individuals, on average, who were employed at the Spencer plant in 1979, only 30 or 40 were former Spencer employees. The bulk of the applicants who were chosen for employment were wholly inexperienced in meat-packing work. The employee turnover rate in the first year was extremely high: for the 220 projected positions at the plant, approximately 525 individuals were hired and approximately 275 were let go. Because of the high turnover and the inexperience of the applicants who were chosen, productivity goals were adversely affected.
 
 Conclusions by the ALJ and the Board
 
 52
 With respect to this issue, the Board agreed with the ALJ's conclusion that SF "was aware that all of Spencer's employees were union members and that it designed and implemented its hiring criteria ... in a discriminatory manner so as to disqualify most of those former employees." 268 N.L.R.B. at 1485. In support of this conclusion, the ALJ cited--and the Board relied upon--numerous subsidiary factual findings. First, the ALJ found that the LOL officials who designed and insisted upon the application of the anti-nepotism rule were aware both that poor labor relations existed at the Spencer plant prior to closure and that a large number of SF's former workforce consisted of individuals who were members of the immediate families of other former Spencer employees, so that application of the anti-nepotism rule would probably disqualify a substantial number of those former employees. Second, the ALJ found that the anti-nepotism rule was not applied uniformly at other operations controlled by LOL. Third, the ALJ found that the remaining criteria--such as prior work history and health--were applied stringently against former Spencer employees, but were often waived or applied very loosely with respect to other applicants. These findings, with which the Board agreed, sufficed in the Board's view to "establish a prima facie case of discrimination," id. at 1485 n. 8, thereby shifting the burden to SF to show that the criteria would have been designed and applied as they were for legitimate business purposes wholly apart from any discriminatory motive. NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 2474-75, 76 L.Ed.2d 667 (1983). The Board concluded that SF failed to carry this burden.
 
 Analysis
 
 53
 Wholly apart from whether SF was obliged to recognize and bargain with the Union regarding the recall of the SF employees who were laid-off at the closure of the Spencer plant, it is clear that SF was nonetheless obliged, in hiring a new workforce, not to discriminate against hiring these individuals (or indeed, any other individuals) because of their union membership. See NLRB v. Burns Int'l Security Serv., Inc., supra, 406 U.S. at 280 n. 5, 92 S.Ct. at 1578 n. 5; IUEW v. NLRB, supra, 604 F.2d at 693. The Board here found that the design and the application of the hiring criteria did have a disparate impact, and resulted from a discriminatory motive. The Board also found that SF had not established that the same action would have been taken for legitimate business purposes even apart from any discriminatory motive. As noted above, the Board's findings and conclusions can only be disturbed if there is no "substantial evidence" in the record to support them. General Teamsters, supra, 723 F.2d at 970.
 
 
 54
 Our careful review of the record leads us to uphold the decision of the Board. The Board is entitled, in making such findings, to consider evidence that is either direct or circumstantial, NLRB v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941); Ridgely Mfg. Co. v. NLRB, 510 F.2d 185, 186 (D.C.Cir.1975), and to infer, if appropriate, the existence of a discriminatory motive on the part of the employer from the employer's conduct itself, NLRB v. Erie Resistor Corp., 373 U.S. 221, 227-29, 83 S.Ct. 1139, 1144-46, 10 L.Ed.2d 308 (1963). As set forth briefly above, the record here is replete with evidence supporting both the disparate impact and the discriminatory motive findings sufficiently establishing a prima facie case. Moreover, we agree that SF failed to carry the burden of rebutting the presumption thereby established: SF's contention that the specially-constructed hiring criteria were designed solely to ensure the productivity of its prospective workers cannot be credited given that, as the ALJ aptly observed, the criteria plainly "catered" to job applicants who were "unskilled and inexperienced." 236 N.L.R.B. at 1505. Accordingly, we uphold the Board's finding that SF violated Section 8(a)(3) and (1) of the Act.
 
 III.
 
 55
 A dispute remains as to the appropriate remedy to be imposed in this case. The ALJ, as noted, found that SF had violated both Section 8(a)(5), with respect to the successorship issue, and Section 8(a)(3), with respect to the discriminatory hiring issue. As a joint remedy for these violations, the ALJ recommended that SF be required to recall all laid-off Spencer employees who would otherwise have been recalled in January of 1979 and thereafter, and to pay to those employees full back pay for any losses suffered by them as a result of either violation. The Board, on the other hand, dismissed the Section 8(a)(5) allegations in the complaint, and thus did not address the question of remedy with respect to that issue. With respect to the Section 8(a)(3) violation, where the Board upheld the ALJ, the Board scaled back the ALJ's recommended remedy. The Board characterized the Section 8(a)(3) violation as consisting only of the failure to consider SF's former employees in a non-discriminatory fashion. Therefore, the Board did not order SF automatically to hire all the laid-off Spencer employees who had applied to work at the reopened plant, but instead only to reconsider those applicants using genuinely non-discriminatory criteria, to hire those who would have thereby been hired, and to provide those individuals with full back pay. The Union urges us to impose the more plenary remedy recommended by the ALJ.
 
 
 56
 We fully appreciate the Union's concern in this matter. The Board has found that SF devised and applied specific hiring criteria designed to discriminate against the laid-off Spencer employees because of their union membership. The Union expresses a legitimate concern that, in light of the evidence in the record with respect to SF's conduct toward the Union in the past, requiring SF merely to reconsider the laid-off Spencer employees for possible rehire according to assertedly non-discriminatory criteria leaves SF considerable leeway to continue to evade the Act, if SF remains adamant in doing so.
 
 
 57
 We agree that the conventional remedy of reinstatement (or in this case, recall) and back pay for the prior workforce, as recommended by the ALJ, would still allow the employer in the course of compliance proceedings to assert any legitimate defenses in individual cases, but would provide the Union with more effective relief from SF's illegitimate effort to keep the Union out of its plant. Cf. Packing House and Industrial Serv., Inc. v. NLRB, 590 F.2d 688, 697-98 (8th Cir.1978). However, the Supreme Court has recently reminded us, in Sure-Tan, Inc. v. NLRB, --- U.S. ----, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), that the enlargement of any remedial order issued by the Board should not be undertaken unilaterally by the courts, but should instead be undertaken in the first instance by the Board, on remand, with the benefit of the opinion of the reviewing Court. Id. at 2813 n. 10, 2816. In this case, we have already determined to remand this matter to the Board on the Section 8(a)(5) issue for further proceedings--including the fashioning of any remedy--in accordance with this opinion. The Board will be required, on remand with respect to the Section 8(a)(5) issue, to take account of the remedy recommended by the ALJ. Any remedial order it might thereby issue may preclude the necessity of any further review of the Union's concerns with respect to the remedy for the Section 8(a)(3) violation. Accordingly, we refrain, at this time, from enforcing the Board's Order with respect to the Section 8(a)(3) violation, so as to allow the Board to reconsider the adequacy of the Board's remedial order in this case as a whole in light of this opinion and with the benefit of the Board's own further proceedings with respect to the successorship issue.
 
 Conclusion
 
 58
 In sum, we affirm the Board's finding that SF discriminated against its former, unionized Spencer plant employees in violation of Section 8(a)(3). However, we reverse the Board's decision to dismiss the Section 8(a)(5) allegations in the complaint, and remand to the Board for further proceedings, including the fashioning of any remedy, in accordance with this opinion. We refrain, for the time being, from granting the Board's cross-application for enforcement of the Board's order with respect to the Section 8(a)(3) violation, but only to allow the Board to reconsider on remand the adequacy of its remedy in light of this opinion and with the benefit of further proceedings on remand on the Section 8(a)(5) issue.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a) (1982)
 
 
 [1]
 As relevant to the consolidated petitions before us, 29 U.S.C. Sec. 158 (1982) provides:
 (a) [i]t shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 ....
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...;
 ....
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 
 
 [2]
 The ALJ's decision is set out as an attachment to the decision and order of the Board. Spencer Foods, Inc., 268 N.L.R.B. 1483, 1493-1512 (1984)
 
 
 [3]
 These four smaller plants included an ancillary fabrication plant in Iowa, a tannery in Wisconsin, a tannery in Massachusetts, and a processed meats plant in Florida
 
 
 [4]
 Iowa is a "right to work" state, and thus the individual production and maintenance employees at the Spencer plant who joined the Union were under no legal obligation to do so. In October of 1977, every one of the 420 production and maintenance employees at the Spencer plant was in fact a member of the Union
 
 
 [5]
 The ALJ based this finding on SF's "conflicting representations to employees and to various governmental agencies over a span of time." 268 N.L.R.B. at 1509. As noted, SF did not inform the Spencer employees prior to closure that they would be considered "terminated." Rather SF expressly stated to the employees that SF would deem the upcoming suspension of operations--to be instituted by SF on its own initiative in much the manner of a lockout--as resulting from a "labor dispute." Id. at 1495. In December of 1977, some number of Spencer employees were sent checks from SF for unpaid vacation that they had accrued in 1977, along with a note stating that "[t]his check is your final compensation payment from Spencer Woods, Inc." Id. at 1497. However, the note made no express reference to "termination" or "discharge," and was sent only to this specific portion of the Spencer workforce. The first time that SF plainly stated to the Union that it considered the Spencer plant employees to have been "terminated" on the date of closure was a full year later, by letter dated December 13, 1978, as specific plans for reopening the plant were being finalized. See infra at 1467 - 68
 In the meantime, a series of other "official" SF representations with respect to the Spencer situation continued to characterize the Spencer workforce as suspended from work due to a "labor dispute" rather than because the Spencer employees had been terminated or discharged. SF expressly represented to the Iowa Department of Job Service Claims Department on November 22, 1977, that the Spencer employees were unemployed not because they had been terminated but instead because of a "labor dispute between the Company and the Union." 268 N.L.R.B. at 1497. On October 2, 1978, a tender offer that issued pursuant to agreement between SF and LOL, see infra at 1466 - 67, stated that SF was uncertain of the course of action it would follow with respect to the Spencer plant were the tender offer to be rejected, and further stated, in its only reference to the Union, not that the Spencer employees had been terminated, but instead that SF and the Union had merely been unable to reach agreement on a contract. As late as May of 1979, SF filed a report with the IRS stating that, for the pension plan year ending October 28, 1978, no financial statements were prepared for the Spencer employees in part because the employees were "on strike" as of the beginning of the plan year. Id. at 1497 n. 5.
 
 
 [6]
 By means of the tender offer, LOL acquired ninety-five percent of SF's stock. LOL then acquired the remaining five percent of SF's shares pursuant to an agreed-upon reverse stock split plan
 
 
 [7]
 The Union disputes this finding, arguing instead that the record shows that 12 of the 19 supervisors and managers after the reopening had been employed by SF previously. As indicated below, we do not in this case view the difference between 7 of 19 and 12 of 19 to be dispositive. Rather, it is sufficient to note that on reopening, a substantial number of the upper level personnel were prior SF employees, and, at the same time, a substantial number were new. See infra at 1473 - 74